IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DOUGLAS HOLLOWAY, and<br>RITA HOLLOWAY,<br><br>    Plaintiffs,<br><br>v.<br><br>MONACO COACH CORPORATION,<br>a corporation of the State of Delaware,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>) C.A. No.: 05-740 JJF<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S OPENING BRIEF ON
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CONCERNING RECOVERABLE PURCHASE PRICE
AND ELDER VICTIMS' ENHANCED PENALTY ACT**

ERISMAN & CURTIN
/s/*Christopher J. Curtin*
Christopher J. Curtin
Bar Identification No. 0226
629 Mount Lebanon Road
P.O. Box 250
Wilmington, DE 19899
(302) 478-5577
ccurtin659@aol.com
Attorney for Plaintiffs

DATED: August 18, 2006

## CONTENTS

TABLE OF AUTHORITIES ............................................ ii

NATURE AND STAGE OF THE PROCEEDINGS ...........................1

SUMMARY OF ARGUMENT ...........................................3

STATEMENT OF FACTS ..............................................4

    The First Coach Was a Lemon ......................................... 4

    The Purchase Price of the 2004 Coach is Listed in the Settlement Documents. . . 5

    The 2004 Coach Was a Lemon. .......................................7

    The Coach Was Out of Service 44 Days of the First 90
    and 270 of the First Year. ........................................ 8

    The Lemon Law Presumption Was Satisfied in the First 90 Days. ............ 9

    The Elder Victim's Enhanced Penalties Act Triggered Treble Damages. ...... 12

ARGUMENT .......................................................14

    I. THE LEMON LAW APPLIES AND REQUIRES THAT DAMAGES MUST
    BE CALCULATED FROM THE FULL PURCHASE PRICE, WITHOUT ANY
    CONSIDERATION OF "FAIR MARKET VALUE." .................... 14

        A. Standard and Scope of Review is the Summary Judgment
        Standard. .......................................... 14

        B. Statutory Construction and Contract Interpretation are Questions of
        Law for the Court. .................................... 15

        C. The Delaware Lemon Law Applies Since the Coach is Registered
        in Delaware ........................................ 16

        D. The Delaware Lemon Law and Uniform Commercial Code Damages
        Begin with the Purchase Price of the Coach, Where Cancellation
        Is the Remedy Sought. ................................ 16

        E. The Holloway's are Entitled to a Refund of the "Full Purchase." . . . 17

        F. The "Full Purchase"Is the Price Stated in the Transfer Papers. . . . . . 18

i

G. Incidental and Consequential Damages Are Recoverable. . . . . . . . 21

H. The "Fair Market Value" Is Not Relevant Where the Consumer
Seeks Cancellation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I. The Result Is the Same under the Uniform Commercial Code. . . . . . 23

J. The U.C.C. Recognizes the Value Given in Negotiation. . . . . . . . . . 24

II. THE ELDER VICTIMS' ENHANCED PENALTIES ACT IS APPLICABLE
FOR TREBLING THE DAMAGES IN THIS CASE. . . . . . . . . . . . . . 27

A. The Standard and Scope of Review on a Motion for Partial Summary
Judgment is as Stated in Argument I, Above. . . . . . . . . . . . . . . . 27

B. The Elder Victims' Enhanced Penalties Act Requires Trebling the
Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C. EVEPA is Constitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

D. Treble Damages Are Mandatory Under EVEPA. . . . . . . . . . . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

UNREPORTED OPINIONS

## TABLE OF AUTHORITIES

**Cases:**

*Abrams v. State*, 689 A.2d 1185 ( Del. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Armbruster v. Unisys Corp.,* 32 F.3d 768 (3d Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bay Management, Inc. v. Beau Monde, Inc.,* 366 So.2d 788
(Fla. Dist. Ct. App. 2 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Carpenter v. Lafayette Woodworks, Inc.*, 653 So. 2d 1187 (La. Ct. App. 1995) . . . . . . 19

*Celotex Corp. v. Catrett,* 477 U.S. 317(1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Clarkson v. Goldstein*, 2005 WL 1331776 (Del. Super.) . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Dunaway v. Ford Motor Co.*, 709 N.E. 2d 947 (Ohio Com. Pl. 1998) . . . . . . . . . . . . . . 19

*Dyer v. Quality Car & Truck Leasing, Inc.*, 1989 WL 214503
(Ohio Ct. App. June 1, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253 (1968) . . . . . . . . . . . . . . . . . . . . . . . . 14

*Goodman v. Mead Johnson & Co.,* 534 F.2d 566 (3d Cir.1976),
*cert. denied,* 429 U.S. 1038,(1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Griffis v. Leisure Time RV, Inc.*, 2004 WL 1773513 (Fla. Dist. Ct. App. Aug. 10, 2004).10

*Harrell Motors, Inc., v. Sweeten,* 628 S.W. 2d 878 (Ark. 1982) . . . . . . . . . . . . . . . . . . 19

*Harmon v. Concord Volkswagen, Inc.*, 598 A.2d 696 (Del. Super. Ct. 1991) . . . . . . . . 16

*Heil v. Nationwide Mut. Ins. Co.*, 371 A.2d 1077 (Del. 1977) . . . . . . . . . . . . . . . . . . . . 30

*Holloway v. Monaco Coach Corp.,* WL 21146720 (D.Del. May 14, 2003) . . . . 1,3-4, 16

*In re Columbia Gas System Inc.*, 50 F.3d 233 (3d Cir.1995) . . . . . . . . . . . . . . . . . . . . . 18

*J & S Coin Operated Machines, Inc. v. Gottlieb,*
362 So.2d 38 (Fla. Dist. Ct. App. 3 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

iii

*Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487 (1941) . . . . . . . . . . . . . . . . . . . . . . 15

*Kruzits v. Okuma Machine Tool, Inc.,* 40 F.3d 52 (3d Cir.1994) . . . . . . . . . . . . . . . . . 15

*Lumpkin v. Envirodyne Industries, Inc.,* 933 F.2d 449, 455-56 (7th Cir.),
    *cert. denied,* 502 U.S. 939 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) . . . . . . . 14

*Mercedes Benz v. Norman Gershman's Things to Wear, Inc.,*
    596 A.2d 1359 (Del. Supr. Ct. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Oliver B. Cannon and Son, Inc. v. Dorr-Oliver, Inc.,* 394 A.2d 1160 (Del.1978) . . . . . 15

*Peacock Constr. Co. v. Modern Air Conditioning, Inc.,* 353 So.2d 840 (Fla.1977) . . . . 15

*Peters Township School Dist. v. Hartford Acc. & Indem. Co.,*
    833 F.2d 32 (3d Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Petruzzi's IGA Supermarkets v. Darling- Delaware,* 998 F.2d 1224 (3d Cir.),
    *cert. denied,* 510 U.S. 994 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ramirez v. Autosport,* 44 A.2d 1345 (N.J. Supr. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*State v. Ismaaeel* 840 A.2d 644 (Del. Super. Ct. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Strachan v. Ford Motor Co.,* 1997 U.S. Dist. LEXIS 5321
    (E.D. Pa. Apr. 17, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*Suburban Trust and Savings Bank v. University of Delaware,*
    910 F.Supp. 1009 (D.Del. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Terex Trailer Corp. v. McIlwain,* 579 So.2d 237 (Fla. Dist. Ct. App. 1 1991) . . . . . . . . 15

*Travelers Indem. Co. v. Lake,* 594 A.2d 38 (Del.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*T.S. Technologies, Inc. v. Rodin Enterprises, Inc.,* 816 F.Supp. 345(E.D. Pa.,1993) . . . 16

*Town of Newton v. Rumery,* 480 U.S. 386 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Williams v. Metzler,* 132 F.3d 937 (3d Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Valhal Corp. v. Sullivan Assoc., Inc.,* 44 F.3d 195 (3d Cir.1995) . . . . . . . . . . . . . . . . . 14

**Statutes:**

*6 Del. C.* §1-103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*6 Del. C.* §1-201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*6 Del. C.* §1-204 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*6 Del. C.* §2-608 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-23

*6 Del. C.* §2-711 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21-24

*6 Del. C.* §2-714 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*6 Del. C.* §2-719 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*6 Del. C.* Ch. 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

*6 Del. C.* §2513. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 28

*6 Del. C.* §2532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*6 Del. C.* §§2580-2583 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3, 11, 27

*6 Del. C.* §2583. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 27, 29-30

*6 Del. C.* Ch 50. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*6 Del. C.* §5001(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*6 Del. C.* §5001(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*6 Del. C.* §5001(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*6 Del. C.* §5002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*6 Del. C.* §5003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*6 Del. C.* §5004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*6 Del. C.* §5009. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 28

*15 U.S.C.* §2310 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*18 U.S.C.* §1014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fla. Stat. Ann. §320.835 (West) ........................................... 10

**Rules:**

F.R.C.P. 30(b)(6) ....................................................... 10

F.R.C.P. 56 ........................................................... 14

**Secondary Authorities:**

Carter & Sheldon, *Consumer Warranty Law,* Nat. Consumer L. Cntr
(3d ed. 2006) §10.2 ................................................... 22

Carter & Sheldon, *Consumer Warranty Law*, Nat. Consumer L. Cntr
(3d ed. 2006) §10.3.2. ................................................ 24

Carter & Sheldon, *Consumer Warranty Law*, Nat. Consumer L. Cntr
(3d ed. 2006) §14.2.8.2 ............................................... 29

Carter & Sheldon, *Consumer Warranty Law,* Nat. Consumer L. Cntr
(3d ed. 2006) §14.2.8.7.1-2 ........................................... 19

Sheldon & Carter, *Unfair and Deceptive Acts and Practices*, Nat. Consumer L. Cntr
(6th ed. 2004 and 2005 supp.) §4.2.2 .................................. 30

Sheldon & Carter, *Unfair and Deceptive Acts and Practices*, Nat. Consumer L. Cntr
(6th ed. 2004 and 2005 supp.) §8.4.1.1 ............................... 29

Sheldon & Carter, *Unfair and Deceptive Acts and Practices*, Nat. Consumer L. Cntr
(6th ed. 2004 and 2005 supp.) §8.4.2.1 ............................... 30

## NATURE AND STAGE OF THE PROCEEDINGS

In October 2000, the Holloways purchased a $170,390, 2001 motor coach made distributed and warranted by Monaco's Beaver Coach division. A311. That coach had severely defective brakes which repeatedly overheated and caused pulling to one side. After some harrowing experiences in traffic, the Holloways demanded remedies under the Delaware Lemon Law and eventually filed suit. A311-12. That case was the subject of a motion for summary judgment decided by Judge Robinson at *Holloway v. Monaco Coach Corp.,* WL 21146720 (D.Del. May 14, 2003) (hereinafter "Holloway I").

In January 2004, that Lemon Law case was settled with, *inter alia,* the replacement of the defective 2001 coach with a 2004 coach (hereinafter the "Coach"). Ex. 2, A32. Because the 2004 Coach was out of service for or waiting for repairs over 270 days in the first year for a number of substantial problems, including fuel tank overflow when filling, fuel dripping onto hot exhaust pipes, extensive water leaks that caused, for example, 2 quarts or rain water to run down the inside of the windshield onto the dash board area, suspension maladjustment, and numerous paint and body defects, the Plaintiffs demanded and sued seeking cancellation of the purchase of the Coach under the Delaware Lemon Law, the Uniform Commercial Code and Magnuson Moss Act, together with damages, prejudgment interest and attorneys fees; and enhancement of the damages under the Delaware Elder Victim's Enhanced Penalties Act, 6 *Del. C.* §2583. A312-14.

The Defendants contend that the statutory refund of the "full purchase" on the cancellation of the purchase of the 2004 Coach is the "fair market value" of the Coach. *See,* A223, A267. Although the Lemon Law and the Settlement Agreement do not mention "fair market value," Defendant insists that it should get credit for the "fair

1

market value" of the 2001 coach without regard to the significant damages and additional payments Plaintiffs made as part of the settlement of the first Lemon coach to acquire the 2004 Coach. This of course, will cause confusion and waste time at trial while evidence is presented on the irrelevant issue of the "fair market value" of the coach, at any particular time.

A Scheduling Order was entered November 28, 2005. Mediation was ordered and completed unsuccessfully in April 2006, with Judge Bifferato. The parties agreed to submit to a second round of mediation through Magistrate Thynge, scheduled for August 29, 2006. A discovery cut-off of June 30, 2006 was extended by the Court upon the stipulation of the parties. Motions with briefs were ordered to be filed by August 18, 2006. A trial scheduling conference is set for September. This motion is timely filed pursuant to ¶8 of the Scheduling Order.

This motion asks the Court to interpret the Settlement Agreement, A18, the Lemon Law "repurchase," and the Uniform Commercial Code "cancellation" remedies, establishing the "purchase" price of the 2004 Coach, Ex. 2, 4, A18-27, A32, and determine from the outset the "full purchase" or "price of the goods."

This motion also asks the Court to interpret the Elder Victims' Enhanced Penalties Act, 6 *Del. C.* §§2580-2583, A253, to determine its applicability in the present case.

2

## SUMMARY OF ARGUMENT

1. Interpretation of the Settlement Agreement, Contract, and the Delaware statutes implicated, are all questions of law for the Court.

2. The Delaware Lemon Law applies to the 2004 Coach, since it is registered in Delaware, and the Plaintiffs were "transferees,"who were "entitled to enforce the warranty" within the meaning of that Act. 6 *Del. C.* Ch 50. *Holloway v. Monaco Coach Corp.,* WL 21146720 (D.Del. May 14, 2003).

3. The "full purchase" to be refunded to the Plaintiffs under the Lemon Law and the U.C.C. cancellation remedy is the $267,730 price adopted in the Sales Contract or Buyer's Order, the financing agreement, the tax Affidavit, and the Defendant's expert's report.

4. The purchase price represents the figure adopted by the parties in the settlement, which includes all consideration recited in the Settlement Agreement ending the litigation over the cancellation of the purchase of the 2001 coach that the 2004 Coach replaced. Delaware Law recognizes that value is given for rights in a purchase or an agreement or contract or negotiation. The recited figure is the culmination of the negotiation of a Settlement Agreement and exchange of rights.

5. The Elder Victim's Enhanced Penalties Act, 6 *Del C.* §§2580-2583 applies to this Lemon Law action. The Lemon Law at §5509 makes violation of the Lemon Law a *per se* violation of the Consumer Fraud Act, 6 *Del. C.* §2513. EVEPA requires trebling of damages for a violation of the Consumer Fraud Act where a victim is over the age of 65. Mrs. Holloway, one of the purchasers of both coaches, was over 65 when the Holloways demanded Lemon Law cancellation, which Defendant refused.

3

## STATEMENT OF FACTS

### The First Coach Was a Lemon.

Mr. & Mrs. Holloway own Rainbow Kennels in Newark, DE, a pet grooming and kennel boarding business. Mr. Holloway was a professional dog show handler, who attended roughly 130 dog shows throughout the United States every year, presenting dogs in the show ring. A311.

The Holloways purchased and financed a Beaver motorcoach, for the first time in 2000. It was a 2001 model Beaver Monterey Seacliff. They purchased both coaches in their own names as opposed to the corporate name, and use each for their personal use, but they drove each to a number of the cities where Mr. Holloway presents a dog at a dog show. They stay in their coach instead of a hotel. They often combine such trips with additional days of vacation. They also use each coach on vacations without any connection to the dog shows. A311.

The first coach they purchased had a very serious brake problem apparently because of mismatched brake components. This caused the brakes to overheat to the point of turning red, and seizing, and sometimes igniting brake fluid. Sometimes the brakes locked on one side, pulling the coach in that direction. The problem was so serious that the National Highway Traffic Safety Administration issued a recall for the problem. Suit was filed in State court and removed by Defendants to this Court, as noted in *Holloway v. Monaco Coach Corp.,* WL 21146720 (D.Del. May 14, 2003). A311.

The Holloways agreed to settle the case concerning the 2001 coach by accepting an upgraded replacement Coach, a 2004 Beaver Monterey Laguna, for which they paid an additional $25,500 and returned the old coach. Ex.2, A18. The new Coach was

4

longer and had more slideouts. The Holloways also gave up a number of valuable damage claims as detailed in Ex. 2-3, A18-30, agreed to cooperate in Monaco's action against the brake manufacturer, and accepted the new 2004 Coach which is the subject of the current litigation. A311-12.

The 2001 coach was returned to Monaco on January 11, 2004. The Holloways had paid the Seller and Monaco in full for that coach, by paying the proceeds of a purchase loan for that coach, and paying a third party lender payments over time. A312. Monaco was paid in full for the 2001 coach through its floor plan arrangement with the dealer. As a result of the cancellation of the 2001 purchase, Monaco did *not* pay off the lien on the 2001 coach, since the new Coach was substituted as collateral for the old coach on the purchase loan, under the Settlement Agreement, Ex. 2, ¶2.1 (h), A19, before the Holloways refinanced to take advantage of declining interest rates, with a different third-party lender. A312.

**The Purchase Price of the 2004 Coach is Listed in the Purchase Documents.**

The purchase of the 2004 Coach is documented, not by a record from Monaco, but by the Buyer's Order from Monaco's authorized dealer, Lazy Days R.V. Center, in Florida, where the purchase was consummated on February 11, 2004. The "Buyer's Order," Ex. 4, A32, states that the "Price of the Unit" was "$267,730.00." The Holloways returned the 2001 coach; paid an additional $25,500.00; and financed the remaining unpaid balance of $119,596.77. A32, 35, 312. As additional consideration for the Settlement Agreement, Ex. 2, A32, the Holloway's promised Monaco assistance and cooperation in prosecuting Monaco's claims against the brake manufacturer. Ex. 2, ¶2.1(n), A20; A312. This and other agreements are listed as "consideration" for the

5

Settlement. A18. In addition, the Settlement Agreement required the Holloway's to give up a number of valuable claims which are detailed at Ex. 3, A29-30, including: financing charges of $46,415.42; out-of-pocket expenses of $23,418.00 for defect related repairs; and prejudgment interest of nearly $90,000. Overall, the Holloways compromised their claims by giving up damages realistically valued at over $329,000.00. The legal basis of each of those claims is also included at Ex. 3, A29-30; A312.

Both Monaco's authorized dealer and transfer agent. Lazy Days,' and Monaco's paperwork for the replacement, 2004 Coach, adopt the purchase price of the 2004 Coach as $267,730.00. Ex. 2 at "Ex. A,"A24-25, and Ex. 4, A32. That price is given in the Buyer's Order, the financing contract, Ex. 5, A35, and the tax affidavit, Ex. 6, A43, all of which where prepared by Monaco's authorized dealer and agent for the transaction. Monaco listed the purchase price in its own paperwork as $267,264.00, before addition the extras listed in Exhibit "B." A25-26. However, even, the report of Monaco's expert, Ex. 31, p. 10, A270, lists and relies upon the "cost" of the 2004 Coach as "$267,730.00." The Coach was transferred to the Holloways in Florida, the manufacturer' express written warranty. The Holloways are the persons entitled by the terms of the warranty Ex. 9, A68, to enforce the obligations of the warranty.

It is clear that Lazy Days and Monaco knew the Coach would be registered and titled in Delaware. The down payment checks were drawn against the Holloways' Delaware bank, Wilmington Trust Company. Ex. 6, A41. They presented their Delaware Drivers licenses as identification. *Id.* They obtained automobile insurance in Delaware, under a Delaware form of policy. A313. Lazy Days prepared the "Retail Installment Contract, Security Agreement and Disclosure Statement," Ex. 5, A34, A313, again

6

showing the Holloways' correct home address in Newark, Delaware. All payments under the contract are paid by the Holloways from their home address in Delaware.

The Holloways registered and titled the Coach in Delaware, and some paperwork to do so was prepared by Lazy Days and provided to the State of Delaware. The tax affidavit shows that no Florida sales tax was paid because the Coach was sold to Delawareans, and the sales price was $267,730.00. A43, A313.

Lazy Days assigned the Retail Installment Sales Contract to the Holloways' current lender. In order to do so Lazy Days necessarily signed the Assignment by Seller at the end of Ex. 5, A39, in which Lazy Days warranted: "4) that this contract accurately and correctly reflects a genuine, bona fide sale and the price and terms thereof, and is valid and in compliance any installment sales law or other applicable state or federal law or administrative regulation;...8) that the down payment is correctly stated in the contract...." A39, A313.

### The 2004 Coach Was a Lemon.

Unfortunately the replacement Coach was also a Lemon. A313. From the date of purchase and during the first year, the Coach was subject to repair 270+ days, A124, for, *inter alia*, dangerous fuel tank overflow; generator fuel dripping on the exhaust system; copious water leaks down the windshield after rain; interior damage from roof and other rain water leaks; ride height and suspension maladjustments; and at least 29 paint and body defects. A313, Exs. 11-23, A111-220. In fact, in the first ninety days, all of these issues were reported to the factory authorized dealer, and the Coach was out of service 44 days, A119, much more than the Lemon Law's statutory 30 day period, as detailed in Exs. 11, 30, A112-126; A258-266; A313.

7

Fuel leaking onto the exhaust resulted in at least one emergency maneuver when smoke billowed so thickly from the Coach that passing motorists honked the horn and called it to the attention of Mrs. Holloway, who was driving alone. She was forced to make and emergency maneuver to pull off the road to attend to the immanent fire risk. In the process some damage was done to the Coach. A313.

The Coach was also subject to repair for extensive rainwater leakage and resulting damage from the roof and other leaks. Many times water poured down the inside of the windshield on first use of the brakes after a rain, and spilled onto the dashboard, which is depicted at Ex. 8, A60. Water soaked and filled the carpets in the storage compartments and damaged the headliner material on the ceiling. A314.

One early repair visit, from March 29, 2004 to April 29, 2004 lasted 32 days for correction of 29 factory paint and body defects under warranty. Ex. 13, A131-145. As explained in detail in a letter to Monaco dated March 17, 2006, Ex. 30, A260, paint defects in a new vehicle are considered Lemon Law defects. A309. While these paint defects impaired the value of the Coach to the Holloways, other problems with the 2004 Coach were much more serious. A314.

**The Coach Was Out of Service 44 Days of the First 90 and 270 of the First Year.**

After 32 days in the shop beginning March 29, 2004 for the paint and body work, the Holloways finally took the coach out for its first trip. They took it back for repairs right away, on May 4, 2004, Ex. 14, A147, due to fuel splashing out of the fuel tank at filling, (which took a year to correct); fuel dripping from the diesel fueled power generator onto the exhaust pipes, creating a cloud of diesel fuel; the roof was leaking so badly that after each rain two quarts of water ran down the inside of the windshield onto

8

and into the dash-board full of electronics and damaged the ceiling, the woodwork, the television, and also collected in the chassis storage areas; the "air-bag suspension" was improperly set up, resulting in extremely rough ride and premature wear of the shock absorbers. Ex. 14, A147-159, A314. The ride height maladjustment was found even before the Coach was delivered to the Holloways. Ex. 32, A293, and was subject of complaints repeatedly thereafter. Ex. 11, A112-126; A314.

From May 4, 2004 to June 8, 2004, the Coach was in the shop for 37 days for the fuel leaks and water leaking into the roof. Ex. 14, A147, A314. From July 7, 2004 to September 30, 2004, the Coach was out of service for 86 days, for fuel leaks, water leaks and other body issues, Ex. 16, A163, A314, while from October 7, 2004 to December 17, 2004, the Coach was subject to repair by Monaco's own technicians for at least 70 days (105 days according to the Repair Invoice) for water leak damage, and fuel leak repairs. Ex. 18, A179; A314. Consequently, the presumption created by the Lemon Law that Monaco had a 30 day "reasonable opportunity to repair" the Coach, applies in this case.

Plaintiff's expert, Wayne Degen, General Manager of Media Camping Center, a seller of Winnebago and other class A coaches confirms that all the conditions listed above substantially impair the use, value or safety of the Coach. Ex. 34, A307-309.

## The Lemon Law Presumption[1] Was Satisfied in the First 90 Days.

---

[1]Section 5004. "Presumptions"provides: "(a) It shall be presumed that a reasonable number of attempts have been undertaken to conform a new automobile to the manufacturer's express warranty if, *within the warranty term or during the period of 1 year following the date of original delivery of the motor vehicle to a consumer, whichever is the earlier date*:

(1) Substantially the same nonconformity has been subject to repair or correction 4 or more times by the manufacturer, its agents or its dealers and the nonconformity continues to exist; or

(2) *The automobile is out of service by reason of repair or correction of a nonconformity by the manufacturer, its agents or its dealers for a cumulative total of more than 30 calendar*

9

The "Chronology," Ex. 11, A112-126, summarizes the available repair invoices, giving the extent of the problems and length of repairs for the Coach. During the first $90^2$ days of the warranty (2-15-04 to 5-15-05) the Coach was out of service for or awaiting service 44 days, A119, already surpassing the Lemon Law requirement. A313-14. In the first 90 days of the Warranty the following nonconformities to the warranty had been reported and subject to repair: 29 Paint and Body defects; diesel fuel spilling from the top of the fuel tank; diesel fuel dripping onto the exhaust from the generator; roof and body leaking water; water leak damage to interior; diesel fumes in the coach and hard fuel filling; Coach hits hard on bumps and will "roll" afterward (suspension). Ex. 13, 14, A130-159; A313-14. In addition to these "Lemon Law" conditions there were a number of U.C.C. warranty nonconformities with the body, such as "slideouts" not closing, and opening by themselves, etc., which were also reported to the dealer. *Id.*

---

*days since the original delivery of the motor vehicle to the consumer.* This 30-day limit shall commence with the first day on which the consumer presents the automobile to the manufacturer, its agent or dealer for service of the nonconformity and a written document describing the nonconformity is prepared by the manufacturer, its agent or dealer. The 30-day limit shall be extended only if repairs cannot be performed due to conditions beyond the control of the manufacturer, its agents or its dealers, including war, invasion, strike, fire, flood or other natural disaster." Emphases added.

[2]Satisfying the Lemon Law in the first 90 days is significant, because Monaco's Warranty on the 2004 Coach contains an unlawful and unconscionable "conclusive presumption" of "business use" Ex. 9, A69, A74, if any business tax deduction is taken concerning the coach. The presumption is used to limit the term of the warranty to the first 90 days. This limitation is only used in litigation situations, according to Robert Harlan, Monaco's Rule 30(b)(6) designee. Florida Law requires a minimum 1 year warranty, without reference to business use, as explained in Ex. 30, A258. Florida's mobile home lemon law applies to recreational vehicles and requires the dealer and the manufacturer to warrant the vehicle for at least twelve months. Fla. Stat. Ann. §320.835 (West); *see*, *Griffis v. Leisure Time RV, Inc.*, 2004 WL 1773513 (Fla. Dist. Ct. App. Aug. 10, 2004 (reversing dismissal of claims against recreational vehicle manufacturer and dealer). The limitation is not an issue since the "Lemon Law" was satisfied in the first 90 days.

10

These same conditions were unrepaired after 44 days. The fuel leaks were reported in the repair invoices Ex.16-17, 18, A162-192; the roof leaking water and resulting interior water damage were reported at Ex. 16, 18; A162, A178; the suspension and ride remained maladjusted 18, 22, A179, A204.

On December 16, 2004 after more than 270 days in the shop during the first year, and while the Coach was still not ready, Mr. Holloway demanded a replacement for the 2004 Coach. Ex. 24, A222. Monaco refused. A314. In January 2005, Monaco offered, not a replacement, but a refund, for $141,441.70 less an "allowance for use" of $23,987.18, Ex. 24, A223, less than half what is required by law, and neither of which comply with the Delaware Lemon Law. A250. The defects were not repaired.

After the Coach was returned to the Holloways on December 17, 2004, it was clear that the work that had taken such a long time, 70 days at Monaco's facility at Lazy Days, was shoddily done. The water stained interior ceiling was so poorly done that when Monaco saw it at one of its factory repair centers in Indiana, it made another factory repair in June 2006. It was leaking again and stained again.

It is not as if the problems the Holloways reported were insubstantial or non-existent. Monaco techs report finding all of the problems, leaking fuel, leaking water, leaking roof, burned out switches, ill fitting slide-outs, and on and on. Ex. 32, A272-294.

In January, 2005, the Hydro-Hot heating and hot water system was discovered to be so badly misaligned that it burned itself up, as a result of apparent faulty manufacture or installation at the factory. No help from Monaco! Monaco would not pay an independent mechanic to do the work to discover the serious, dangerous problem. Ex. 20, A198-200; A314. The Coach was in the shop 6 weeks on that occasion. A314. The

11

Holloways later paid $1,200 to have the problem addressed, with a rebuilt unit. Ex. 21,
A202; A314. At the same time that Monaco refused to pay for a proper repair to an
authorized repair facility, Monaco was recalling all coaches containing this heater
because of the danger of fire. Ex. 26, A232. When Mr. Holloway later paid for the
repair, the repairman discovered that the Hydro-Hot burner had burned through and
melted critical components, presenting the danger Monaco was forced to admit in its
recall. A202. The parts make an impressive exhibit. A314. While this may not be a
Lemon Law violation, it is a violation of the U.C.C. warranty provisions, yet the
Holloways were not reimbursed, after the initial repair was refused. Ex.20-21, 26, A198-
202, A232. In addition to this expense, the Holloways suffered the damages summarized
at Ex. 27, A234.

Despite the Delaware Lemon Law requirement that the "full purchase" be
returned, and not mentioning "fair market value" anywhere, Monaco has insisted that the
purchase price is reduced by some factor involving the fair market value of the 2001
coach, and apparently intends to present an expert for the point at trial. A223, A312.

**The Elder Victim's Enhanced Penalties Act Triggered Treble Damages.**

In December, 2004, when the Holloways demanded their Lemon Law remedy of
replacement of the replacement Coach, A222, Mrs. Holloway was 65 years old, Ex. 6,
A41, A315, triggering a Delaware consumer protection statute, The Elder Victims
Enhanced Penalties Act, Ex. 29, A254. As explained in the Notice/Demand letter, Ex. 1,
A15-16, EVEPA triggers triple damages "in addition" to the actual damages to which
the Holloways are entitled.

The Holloways exercised their Lemon Law rights by demanding a replacement

12

for the Coach on December 16, 2004. Ex. 24, A222. That demand was refused, in
violation of the Lemon Law. A223, A314. At the time of the this violation, Mrs.
Holloway was over the age of 65, Ex. 6, A41, thus triggering the enhanced penalties
authorized by EVEPA, as discussed below.

As summarized in the "Chronology," Exhibit 11, A112-126, the Coach was out of
service more well more than 30 days during the first 90 days after purchase, and well
over 200 days in the first year after purchase for the recited defects and the resulting
damage. In short, it is a clear Lemon Law case. The real issue however, is what is the
"full purchase" of the replacement Coach to be reimbursed under the Lemon Law?

13

## ARGUMENT

## I. THE LEMON LAW APPLIES AND REQUIRES THAT DAMAGES MUST BE

## CALCULATED FROM THE FULL PURCHASE PRICE, WITHOUT ANY

## CONSIDERATION OF "FAIR MARKET VALUE."

### A. The Standard and Scope of Review is the Summary Judgment Standard.

This is Plaintiff's motion for partial summary judgment under F.R.C.P. 56.

"Under the Federal Rules of Civil Procedure, the Court shall grant a motion for
summary judgment if it determines 'that there is no genuine issue as to any material
fact and that the moving party is entitled to judgment as a matter of law.' Fed. R. Civ.
P. 56(c). The moving party has the initial burden of demonstrating that it should
prevail under Rule 56(c), see *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
475 U.S. 574, 585-86, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986), which can be
accomplished by simply pointing out to the Court that there is an absence of evidence
to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325,
106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986); *see also Peters Township School
Dist. v. Hartford Acc. & Indem. Co.,* 833 F.2d 32, 34 (3d Cir.1987). In opposition,
the nonmoving party must come forward with evidence supporting a claim that there
is a genuine issue of material fact in dispute which requires resolution by the trier of
fact. *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592-93,
20 L.Ed.2d 569 (1968).

An issue is genuine 'if the evidence is such that a reasonable jury could return a
verdict for the nonmoving party.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,
248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). 'Material facts' are those which,
under applicable substantive law, might affect the outcome of the case. *Armbruster v.
Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994) (citing *Anderson,* 477 U.S. at 248, 106
S.Ct. at 2510). All reasonable doubts and inferences must be resolved in favor of the
nonmoving party when reviewing each motion for summary judgment. 'The
nonmovant's allegations must be taken as true and, when these assertions conflict
with those of the movant, the former must receive the benefit of the doubt.' *Valhal
Corp. v. Sullivan Assoc., Inc.,* 44 F.3d 195, 200 (3d Cir.1995) (quoting *Goodman v.
Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038,
97 S.Ct. 732, 50 L.Ed.2d 748 (1977)). In drawing these inferences, the Court may
not make credibility determinations or weigh evidence. *Petruzzi's IGA Supermarkets
v. Darling- Delaware,* 998 F.2d 1224, 1230 (3d Cir.), *cert. denied,* 510 U.S. 994, 114
S.Ct. 554, 126 L.Ed.2d 455 (1993).

\*\*\*

### B. Choice of Law

As a threshold matter, a federal court sitting in diversity must address the issue of

14

what law governs the rights and liabilities of the parties before it. In so doing, the Court looks to the substantive law of the forum state in which it sits, *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); the forum state's choice of law doctrine is included within its substantive law, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Kruzits v. Okuma Machine Tool, Inc.,* 40 F.3d 52, 55 (3d Cir.1994). Because the issues at summary judgment turn on contract construction, the Court must examine Delaware's choice of law provisions for matters sounding in contract. Delaware has adopted the 'most significant relationship test' as the choice of law rule relevant to the instant issues. *Travelers Indem. Co. v. Lake,* 594 A.2d 38 (Del.1991); *Oliver B. Cannon and Son, Inc. v. Dorr-Oliver, Inc.,* 394 A.2d 1160, 1166 (Del.1978)."

*Suburban Trust and Savings Bank v. University of Delaware*, 910 F.Supp. 1009 (D.Del.

1995). Emphases added. Clearly, Delaware has the most significant contact to the

Settlement Agreement, as well as the Coach and the Delaware consumer protection statutes.

**B. Statutory Construction and Contract Interpretation are Questions of Law**

**for the Court.** This motion seeks determination of the "full purchase" price of the 2004

coach, as a matter of law, within the meaning of the Delaware Lemon Law. The Purchase

Contract, Ex.4. was executed in Florida, with the understanding that the Coach would be

registered in the State of Delaware, Ex. 6, "Affidavit for Partial Exemption of Motor Vehicle

Sold for Licensing in Another State," prepared by Lazy Days. A43.

Since the purchase documents were executed in Florida, it would not be unreasonable

to apply Florida law to them. Courts in this Circuit have applied the following contract

interpretation principles from Florida, which are the same as Delaware's:

"The construction of a contract is governed by the intention of the parties; where the nature of the transaction lends itself to judicial interpretation, the parties' intention may be determined as a matter of law, first, by looking to the express language used, and, second, from the apparent objects to be accomplished, from other provisions in the agreement, and from the surrounding circumstances at the time of the formation of the agreement. *Peacock Constr. Co. v. Modern Air Conditioning, Inc.,* 353 So.2d 840, 842 (Fla.1977); *Terex Trailer Corp. v. McIlwain,* 579 So.2d 237, 242 (Fla. Dist. Ct. App. 1 1991); *J & S Coin Operated Machines, Inc. v. Gottlieb,* 362 So.2d 38, 39 (Fla. Dist. Ct. App. 3 1978). In

15

construing a contract as a matter of law, I am bound to interpret the contract in a manner that is consistent with the reason, probability, and practical aspects of the underlying transaction. *Bay Management, Inc. v. Beau Monde, Inc.,* 366 So.2d 788, 791 (Fla. Dist. Ct. App. 2 1979.)"

*T.S. Technologies, Inc. v. Rodin Enterprises, Inc.,* 816 F.Supp. 345, at 349 (E.D. Pa.,1993)

## C. The Delaware Lemon Law Applies Since the Coach is Registered in

**Delaware.** It is clear that the Delaware Lemon Law applies to the Coach, even though it was transferred[3] to the Holloways in Florida. The Delaware Lemon Law defines: "Automobile" to mean "any passenger motor vehicle ... which is ... registered by the Division of Motor Vehicles in the Department of Public Safety except the living facilities of motor homes." 6 *Del. C.* §5001(5). This section makes it clear that the Lemon Law: 1.) covers automobiles purchased out-of-state but registered in Delaware. *Holloway v. Monaco Coach Corp.,* WL 21146720 (D.Del. May 14, 2003)(Concerning the 2001 coach); *Harmon v. Concord Volkswagen, Inc.*, 598 A.2d 696 (Del. Super. Ct. 1991); and 2.) covers motor homes, other than the living facilities. *Holloway, supra.* Since the Holloways' Coach is registered in Delaware, and its conditions include the body and paint defects, fuel leaks, water leaking into the driving compartment, and suspension defects it is covered by the Delaware Lemon Law. *Id.*

## D. The Delaware Lemon Law and Uniform Commercial Code Damages Begin with the Purchase Price of the Coach, Where Cancellation Is the Remedy Sought. Under the Delaware Lemon Law, the manufacturer owes a duty to cure a warranty nonconformity in a "reasonable period of time" or a "reasonable number of

---

[3]The Holloways are "consumers" under the Lemon Law, since they are each "a person to whom an automobile is *transferred* during the duration of an express warranty applicable to the automobile..." and "are entitled by the terms of the warranty to enforce obligations of the warranty. " 6 *Del.C.* §5001(1)

16

attempts." 6 *Del. C.* §§5002-5003. If an "Automobile," including a motor coach, is

unrepaired after four attempts, or out of service for, or awaiting repairs for more than

thirty days during the first year or the warranty period, the purchaser is entitled to return

the "Automobile" to the manufacturer, and obtain a refund of the "full purchase," less a

reasonable allowance for use. 6 *Del. C.* §5003(a), (c). Ex. 26, A249. This substandard

Automobile/Coach was out of service for or awaiting repairs far longer than the statutory

period regardless whether that period is 90 days or 1 year.

The Delaware Lemon Law, in a "repurchase"situation requires the Manufacturer to:

**"§ 5003. Remedies upon failure to repair.**

(a)....repurchase the automobile from the consumer and *refund to the consumer the **full purchase**, including all credits and allowances for any trade-in vehicle*; provided, however, that the consumer shall have the unqualified right to decline a replacement automobile and to demand instead a repurchase.
\*\*\*

(c) In instances in which a refund is tendered under this section, the manufacturer *shall accept return of the automobile* from the consumer and shall reimburse the consumer for related *purchase costs, including sales taxes, registration fees and dealer preparation fees*, less:

(1) a reasonable allowance for the consumer's use of the automobile, not to exceed the *full purchase price* of the automobile multiplied by a fraction which consists of the number of miles driven *before the consumer first reported the nonconformity to the manufacturer, its agent or dealer* divided by 100,000 miles..."[4] Emphases added.

**E. The Holloway's are Entitled to a Refund of the "Full Purchase."** The "full

purchase" price of $267,730.00 is stated in the Buyer's Order, Ex. 4, A32, the Retail

Installment Contract, Ex. 5, A35, the "Affidavit of Partial Exemption of Motor Vehicle

---

[4]Plaintiffs accept the allowance for use as a deduction from the purchase price. The mileage difference between when the coach was purchased and when the problems were first reported are 3,423 miles at purchase (Ex. 5) -3,436 miles at first repair (Ex. 13) a difference of 13 miles /100,000 miles x $267,730.00 = $34.80, not the $23,987.18 alleged by Monaco. Ex. 24, A223.

17

Sold for Licensing in Another State," Ex. 6, A44, all of which were prepared by Lazy

Days R.V. Center, Monaco's authorized dealer, and agent for the transfer of the Coach to

the Holloways. Even Monaco's expert relied upon the same figure in preparing his

report for Monaco. Ex. 31, A270.

While it is true that the transfer of the 2004 Coach to the Holloways was the result

of a negotiated settlement of a claim, Ex. 2, A18, which was worth more than $267,000,

Ex. 3, A29, that does not change the $267,730 of the documents as the Delaware Lemon

Law "full purchase" determination.[5]  Exhibit A to the Settlement Agreement lists the

price of the Coach as $267,264, without delivery charge ro extras. Ex. 2, A25.

Moreover, the Retail Installment Sales contract provided to Bank America for the

financing of the of the transfer of the Coach to the Holloways gives the value of the 2001

trade-in as $148,133.23, while financing an additional 119,596.77 for a total purchase

price of $267,730.00. Ex. 5, A35. Given the unambiguous contract language that the

purchase price is $267,730.00, and inclusion of that figure in the Settlement Agreement,

judgment should be entered that it is the purchase price of the 2004 Coach for the

purposes of the Delaware Lemon Law, the U.C.C. and the damages to be calculated

under either.

**F. The "Full Purchase" Is the Price Stated in the Transfer Papers.** Monaco

---

[5]Judicial interpretation of an unambiguous settlement agreement is also a question of law for the Court to decide. *In re Columbia Gas System Inc.*, 50 F.3d 233, at 238 (3d Cir.1995); *Lumpkin v. Envirodyne Industries, Inc.,* 933 F.2d 449, 455-56 (7th Cir.), *cert. denied,* 502 U.S. 939 (1991) (Even if the settlement agreement is ambiguous, but the evidence is not disputed, interpretation remains a matter of law for the court."). Since the Settlement Agreement, Ex. 2, A18, derives from a federal right to sue, here, the Federal Magnuson Moss Warranty Act, 15 U.S.C. §2310, federal common law principles govern interpretation of the agreement. *Town of Newton v. Rumery,* 480 U.S. 386, 392,(1987); *Williams v. Metzler,* 132 F.3d 937 at 946 (3d Cir.1997).

18

is expected to argue that the fair market value of the 2001 or the 2004 Coach somehow affects or reduces the "full purchase" of the 2004 Coach for purposes of the Delaware Lemon Law refund. In contrast, the Delaware Lemon Law does not even use the term or concept of "fair market value." Even under the Uniform Commercial Code, where the remedy sought is "cancellation" by revocation of acceptance, the buyer is entitled to recover "so much of the purchase price as has been paid." *See, e.g., 6 Del. C.* §2-711(1). Here, the "full purchase" for refund to the Holloways, was paid through the return of the 2001 coach, payment of an additional $25,500.00, financing the remaining balance of $119,596.77, agreement to help in Monaco's claims against the brake manufacturer, and release of other valuable damage and other claims. Ex. 2-4, A18-33.

Merchants facing the remedy of "cancellation" frequently try to demonstrate that they are entitled to some discount based upon the allegedly inflated value they assign to the "trade-in" in order to induce the purchase. Carter & Sheldon, *Consumer Warranty Law,* Nat. Consumer L. Cntr, (3d ed. 2006) at §14.2.8.7.1-2 discuss this in concluding that the purchase price is what is stated in the papers:

"The refund of the trade-in is the amount actually allowed by the seller, even if the manufacturer claims that it is inflated, at least in the absence of convincing evidence establishing otherwise. *Strachan v. Ford Motor Co.*, 1997 U.S. Dist. LEXIS 5321 (E.D. Pa. Apr. 17, 1997). *But, cf., Carpenter v. Lafayette Woodworks, Inc.*, 653 So. 2d 1187 (La. Ct. App. 1995) (upholding trial court's discretion to disregard inflated trade-in value in calculation revocation award under U.C.C.) Even when the evidence is clear that the recited trade-in allowance is inflated to avoid negative equity, policy considerations bar any alteration of the recited amount. *Dunaway v. Ford Motor Co.*, 709 N.E. 2d 947 (Ohio Com. Pl. 1998). *See also, Strachan v. Ford Motor Co.*, 1997 U.S. Dist. LEXIS 5321 (E.D. Pa. Apr. 17, 1997) (N.J. law) (ordering refund without regard to negative equity when dealer failed to show actual value of trade-in and allegedly inflated value was recorded on the documents); *Harrell Motors, Inc., v. Sweeten,* 628 S.W. 2d 878 (Ark. 1982) (affirming trial court's rejection of seller's attempt to testify in repossession dispute that the price on the sale contract did not reflect true sale price but was inflated in order to obtain financing); *Dyer v. Quality Car & Truck Leasing, Inc.*, 1989 WL 214503 (Ohio Ct. App. June 1, 1989) (adopting value that dealer placed on trade-in at time of sale, notwithstanding later claim that it was inflated to cover negative equity). *But, cf.,*

19

*Carpenter....* Otherwise, courts would constantly be called on to go behind the documents, either at the buyers's or the seller's behest. <u>The value stated in the contract is the value that should be assigned to the trade-in, not the private valuation that the dealer may have made but that it did not present either to the consumer or to the entity that financed the transaction.</u> *Ramirez v. Autosport,* 44 A.2d 1345 (N.J. Supr. 1982); *See also, Strachan v. Ford Motor Co.*, 1997 U.S. Dist. LEXIS 5321 (E.D. Pa. Apr., 17, 1997) (ordering refund without regard to negative equity when dealer failed to show actual value of trade-in and allegedly inflated value was recorded on the documents).

It should be awkward for a dealer to insist that the trade-in value was inflated to cover negative equity, as the purpose can only be to deceive either the consumer or the financing entity. Knowing, false statements or overvaluation of security for the purpose of influencing an action of a federally-insured institution is a crime. 18 *U.S.C.* § 1014."

Notably, Lazy Days assigned the Retail Instalment Sales Contract, Ex. 5, A35 to the Holloway's current lender. In order to do so, Lazy Days, as Monaco's authorized dealer and agent for this transaction, and in its own right necessarily signed the Assignment by Seller at the end of Ex. 5, A39, in which Lazy Days warranted: "4) that this contract accurately and correctly reflects a genuine, bona fide sale and the price and terms thereof, and is valid and in compliance any installment sales law or other applicable state or federal law or administrative regulation;...8) that the down payment is correctly stated in the contract...." A39, A313. This triggers the policies recited above.

The "full purchase" price noted in all of the purchase and financing papers, the Settlement Agreement for the 2004 Coach, and relied upon by Monaco's expert is $267,730.00. Whether or not the 2001 is considered a trade-in, the Lemon repurchase in this case is analogous, and the policy considerations are the same.

No argument should be considered from Monaco that there should be some allowance for trade-in of the 2001 coach especially not based on its "fair market value." This is because, the settlement agreement makes it crystal clear that there was additional consideration for the transfer of the 2004 Coach. The Settlement Agreement document Ex. 2, A17, which was prepared by Monaco's attorneys, says that the settlement is in

20

consideration for the resolution of the prior case. As "consideration" for the Settlement, Monaco sought and was given the Holloway's promise of assistance and cooperation in prosecuting Monaco's claims against the brake manufacturer. A20. In addition, the Settlement Agreement required the Holloway's to give up as "further consideration" A20, a number of valuable claims which are detailed at Ex. 3, A29-30, including: recovery of financing costs of $46,415.42; recovery of out-of-pocket expenses for defect related repairs of $23,418.00; and prejudgment interest of nearly $90,000. The legal bases of those claims is also included at Ex. 3, A29-30. Added to the purchase price of the 2001 coach, of $170,390.52, the value of the claims as to the 2001 coach exceed $329,000. Ex. 3, A30. If consideration of evidence other than the price in the papers is permitted, then so is the value of the damages given up, which the Settlement Agreement recites as consideration and "further consideration." Ex. 2, ¶3, A20.

**G. Incidental and Consequential Damages Are Recoverable.** Of course, there are additional damages recoverable for breach of warranty. Those damages and the legal justification for them are recited in the Summary of Damages, Ex. 27, A234-35. In addition to the direct damages such as the purchase price and finance charges, "incidental and consequential damages" are recoverable under the Uniform Commercial Code. §§2-608; 2-711. This is true despite warranty language that purports to limit liability for incidental and consequential damages. Since Monaco and LazyDays could not repair the Coach in a reasonable time, the warranty in this case "failed of its essential purpose" within the meaning of 6 *Del. C.* §2-719(2). *Mercedes Benz v. Norman Gershman's Things to Wear, Inc.*, 596 a.2d 1359 and 1362 (Del. 1989). When a warranty "fails of its essential purpose," all remedies afforded by the Code are available. Thus, despite limiting language to the contrary, all damages permitted by the *U.C.C.* are recoverable.

21

*Id.*

**H. The "Fair Market Value" Is Not Relevant Where the Consumer Seeks**

**Cancellation.** Neither the Lemon Law nor the Uniform Commercial Code allows

consideration of the "fair market value" in cancellation remedies, only in situations

where the consumer keeps the goods, and recovers the difference in value between the

impaired goods and unimpaired goods.

The Lemon Law remedy of "repurchase" (vs. "replacement") of the "automobile"

6 *Del. C.* §5003(a), (c),[6] is the same as the U.C.C. action for "cancellation" of the sale,

under 6 *Del. C.* §§2-711 (Buyer's remedies include cancellation); 2-608, (Revocation of

acceptance). The damages authorized by the U.C.C. as well as the Delaware Lemon Law

is the full purchase price, with some adjustments. Some of the returned proceeds must go

to any lender under the Lemon law. 6 *Del. C.* §5003. ("(d) Refunds shall be made to the

consumer, and lienholder, if any, as their interests may appear." "Section 5001 defines

"(8) 'Lienholder' means a person with a security interest in an automobile pursuant to a

lien.")

Carter & Sheldon, *Consumer Warranty Law,* Nat. Consumer L. Cntr, (3d ed.

2006) at §10.2. explain:

> "A buyer who cancels a sale is no longer obligated to pay the purchase
> price and has the right to recover any amount of the purchase price that has
> already been paid. In addition, the cancelling buyer may recover damages

---

[6]Section **5003. Of the Lemon Law "Remedies upon failure to repair," states:**
"(a) If the manufacturer, its agent or its authorized dealer does not conform the
automobile to any applicable express warranty by repairing or correcting any nonconformity
after a reasonable number of attempts, *the manufacturer shall* either replace the automobile with
a comparable new automobile acceptable to the consumer or *repurchase the automobile from the
consumer and refund to the consumer the full purchase, including all credits and allowances for
any trade-in vehicle;* provided, however, that the consumer shall have the unqualified right to
decline a replacement automobile and to demand instead a repurchase."

22

representing the increased cost of substitute goods.

     If on the other hand the buyer keeps the goods rather than cancelling the sale, the measure of direct damages is the reduction in value of the goods caused by the seller's breach of warranty.

     These two measures of damages are alternatives. The buyer who keeps the goods can not recover the purchase price, and the buyer who cancels can not recover damages for the diminution in value of the goods. <u>The diminution in value of the goods is irrelevant to the buyer who cancels. Such a buyer is not keeping the goods, but is returning them to the seller. It is the seller who will bear their reduced value.</u> For these reasons, the buyer who cancels need not prove the diminution in value. This fact is an advantage of the revocation remedy, as proving diminution in value can be difficult.

     One element of the damage award is the same regardless of whether the buyer cancels. Both the buyer who cancels and the buyer who keeps the goods are entitled to incidental and consequential damages." Emphases added.

Clearly, the difference in value is the measure of damages when a person <u>keeps the vehicle</u> *instead of* cancellation. 6 *Del. C.* §2-714. (Official Comment to this section states: "This section deals with remedies available to the buyer after the goods have been accepted, and the time for revocation of acceptance has gone by.") Consequently the recoverable damages upon cancellation is the full purchase price less the Lemon Law "Allowance for Use." The remedy of Lemon Law repurchase or U.C.C. §2-608, 2-711 "cancellation" requires the seller to return "so much of the purchase price as has been paid," and requires the buyer to return the goods. Cancellation or repurchase requires exchange of the full purchase price for the defective goods.

No value other that the purchase price is relevant in this cancellation case, including "fair market value."

**I. The Result Is the Same under the Uniform Commercial Code.** The repurchase remedy of the Lemon law is analogous to the U.C.C. remedy of §2-608 "cancellation" of the sale by "revocation of acceptance."[7] Revocation of acceptance

---

[7]Section 2-608 "Revocation of Acceptance in Whole or Part" provides:
"(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity

23

authorizes the remedies described by §2-711,[8] which expressly authorizes a buyer who

has justifiably revoked acceptance to recover "so much of the price, as has been paid" in

addition to other remedies, including incidental and consequential damages. Carter &

Sheldon, *Consumer Warranty Law*, Nat. Consumer L. Cntr (3d ed. 2006) §10.3.2.

**J. The U.C.C. Recognizes the Value Given in Negotiation.** The "additional

consideration" given in the settlement agreement for the transfer of a more expensive

replacement Coach for the first Lemon coach is "value" that is recognized under the

U.C.C. and should be recognized in the recoverable purchase price. The U.C.C.

definitions state:

> "Except as otherwise provided in Articles 3, 4, and 5, *a person gives value for rights if the person acquires them*:
>
> (1) In return for a binding commitment to extend credit or for the extension of immediately available credit, whether or not drawn upon and whether or not a charge-back is provided for in the event of difficulties in collection;
>
> (2) As security for, or *in total or partial satisfaction of, a preexisting claim*;

---

substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

[8]Six *Del.C.* §2-711 states: "(1) *Where* the seller fails to make delivery or repudiates or *the buyer* rightfully rejects or *justifiably revokes acceptance* then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2-612), *the buyer may cancel and* whether or not he has done so may *in addition to recovering so much of the price as has been paid...."* Emphasis added.

(3) By accepting delivery under a preexisting contract for purchase; or

(4) *In return for any consideration sufficient to support a simple contract.*"

Emphasis added. 6 *Del.C.* §1-204. Moreover, the terms "purchase"[9] and "purchaser,"

include the full range of consideration for acquisition or sale of goods, including the

Coach:

"(29)'Purchase' means taking by sale, lease, discount, *negotiation*, mortgage, pledge, lien, security interest, issue or reissue, *gift*, or *any other voluntary transaction creating an interest in property*.

(30) 'Purchaser' means a person that takes by purchase."

6 *Del.C.* §1-201. Clearly, the rights given up by each side in the Settlement Agreement

support a contract, and constitute "value" that contributed to the "purchase" of the Coach.

The value should be given recognition in the adopted price of the 2004 Coach set by Ex.

4, A32, which represents compromise of Plaintiffs' higher damages and Monaco's

exposure.

Like the Lemon Law,

"(a) *The Uniform Commercial Code must be liberally construed* and applied to promote its underlying purposes and policies, which are:

(1) To *simplify*, clarify, and modernize the law governing commercial transactions;

(2) To permit the continued expansion of commercial practices through custom, usage, and agreement of the parties; and

(3) To make uniform the law among the various jurisdictions.

(b) Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud,

---

[9]While the Lemon Law does not define the term "Purchase" although it authorizes the refund of the "full purchase," the U.C.C., to which it is related, does. This definition is the legislatively stated public policy of Delaware that Purchase is as broad as Plaintiffs assert.

misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or
invalidating cause supplement its provisions." Emphases added.

6 *Del.C.* §1-103. If the Court does not accept the "full purchase" as the price stated in
the Settlement Agreement, Buyer's Order, Financing Agreement, the tax exemption
affidavit, and defense expert report, the trial will be opened to the value of the rights
given up by each side in the settlement, which will not "simplify" the transaction or the
trial.

The Court must interpret the Settlement Agreement, Buyer's Order, and related
documents, the Lemon law and the U.C.C. as establishing $267,730.00 as the "full
purchase" of the replacement Coach to be refunded.

## II. THE ELDER VICTIMS' ENHANCED PENALTIES ACT IS APPLICABLE FOR TREBLING THE DAMAGES IN THIS CASE.

**A. The Standard and Scope of Review on a Motion** for partial summary

judgment is as stated in Argument I, above.

**B. The Elder Victims' Enhanced Penalties Act Requires Trebling the Actual**

**Damages**. The Elder Victims' Enhanced Penalty Statute, ("EVEPA"), 6 *Del. C.* §2580-

2584, requires that a person over the age of 65 who suffers "actual damages" for a

violation of Title 6, Chapter 25, subchapter II, shall have their "compensatory damages"

trebled, *"in addition* to any other damages to which the victim is entitled pursuant to

common law or other provisions of the Delaware Code." EVEPA states:

**"§ 2583 Cause of action; enhanced penalties.**

(a) An elder[6] or disabled person who suffers damage or injury as a result of an offense or violation described in this chapter[7] has a *cause of action* to recover *actual damages*, court

---

[6]"'Elder Person' means a person who is 65 years of age or older." 6 *Del. C.* §2580.

[7]The term "this chapter," refers to Chapter 25 of Title 6 of the Delaware Code. Section 2583 confers a private right of action for a violation of any Chapter 25 statutes. *See,* for example, the Deceptive Trade Practices Act, §2532, which, prior to EVEPA has afforded no private right of action. Chapter 25 contains the following consumer protection statutes, for which elder victims by this section are permitted a private right of action for damages, treble damages, and attorneys fees.

Chapter 25. Prohibited Trade Practices:

Subchapter I. General Provisions (Includes Unordered Merchandise);
Subchapter II. Consumer Fraud;
Subchapter III. Deceptive Trade Practices;
Subchapter IV. Distribution of Credit Cards;
Subchapter V. Security for Franchised Distributors;
Subchapter VI. Pyramid or Chain Distribution Schemes;
Subchapter VII. Buyer Property Protection Act;
Subchapter VIII. Enhanced Penalties When Elder or Disabled Person Targeted;
Subchapter IX. Home Food Service Plan Sales;

costs and reasonable attorney's fees.

(b) If a private cause of action is brought by the victim of a violation of this subchapter,[8] and said victim was 65 years of age or older or a disabled person when the violation occurred, the victim shall be entitled to recover 3 times the amount of the victim's *compensatory damages* if a violation of this subchapter is established. Such treble damages shall be in addition to any other[9] damages to which the victim is entitled pursuant to common law or other provisions of the Delaware Code."

The Lemon Law, 6 *Del. C.* §5009 makes the violation of the Lemon Law a *per se* violation of the Consumer Fraud Act. ("... a violation of this chapter shall be an unlawful practice as defined in §2513 of this title.") Consequently, a violation of the Lemon Law, is subject to treble damages as a consequence of EVEPA.

In the present case, Mrs. Holloway turned 65 on June 2, 2004. Ex. 6, A41, shows her drivers license and her birthday. It was not until December, 2004 that the Holloways demanded a replacement coach under the Delaware Lemon Law. Ex. 24, A222. Monaco's refusal to replace or repurchase in accordance with the Lemon Law, Ex. 24, A223; A314, violated the Lemon Law. "The right to a lemon law remedy is determined by the consumer's proper rejection of the car after the requisite number of unsuccessful repair attempts, not by the car's later repair." Carter & Sheldon, *Consumer*

---

Subchapter X. Charitable/fraternal Solicitation;
Subchapter XI. Cumulative Remedies and Enhanced Penalties.

In addition, the following Title 6 statutes not found in Chapter 25 create *per se* violations of §2513 of the Consumer Fraud Act: Ch. 25A. Telemarketing, § 2503A; Ch. 25B. Water Treatment System Sales, § 2504B; Ch. 36. New Home Buyer's Protection Act, §3603; Ch. 44. Home Solicitation Sales, §4404; Ch. 49A. Auto Repair Fraud Prevention, §4909A; Ch 50. Automobile Warranties (Lemon Law), §5009.

[8]The "Subchapter" is 6 *Del. C.* Ch. 25, Subchapter VIII, which contains the private right of action for violation of Chapter 25, which includes the Consumer Fraud Act

[9]Presumably, these other damages would not be the "Compensatory" damages that are trebled by the section. It necessarily refers to the Statutory penalty authorized by earlier sections, other statutes, or common law punitive damages.

28

*Warranty Law*, Nat. Consumer L. Cntr (3d ed. 2006) §14.2.8.2. Indisputably, Mrs. Holloway was over the age of 65 at that time. Consequently, the EVEPA requires tripling her "actual damages."

Delaware courts have thus far only applied the "Civil Penalty" provision of this Act under an earlier version of the Act, in *Clarkson v. Goldstein*, 2005 WL 1331776 (Del. Super. Ct.), probably because Section 2583(b) was added later, effective June 2003, and was not available when *Clarkson* was defrauded, in 2001.

Section 2583(b), which mandates trebling damages for a violation of EVEPA, necessarily refers to a private right of action under subsection (a). The Act has no affirmative requirements of its own, but is intended to enhance the damages and penalties for violations of certain statutes for certain victims. Section 2583(a) declares a private right of action and recovery of costs and attorneys fees, even where not prescribed by the particular statute, for persons 65 or over when the violation occurs. Section (b) requires any damages incurred for a violation of the covered statutes to be trebled, but only if the victim is 65 or older.

**C. EVEPA is Constitutional.** A number of states have statutes providing enhanced penalties and damages for elder or handicapped consumers. California , Hawaii, and Kansas have minimum statutory damage statutes. Sheldon & Carter, *Unfair and Deceptive Acts and Practices*, Natl. Consumer Law Cntr. (6th ed. 2004 and 2005 supp.) §8.4.1.1. All have survived constitutional challenge. *Id.*

Delaware comports with this. In the appeal of a theft conviction, the Delaware Supreme Court held that the enhancement of the penalty for theft to make it a felony where the victim is over 60 years old was constitutional. *Abrams v. State*, 689 A.2d

1185 ( Del. 1997) "Because protecting the elderly is neither an arbitrary nor irrational basis upon which to make an age-based distinction under section 841, this provision does not violate the Equal Protection Clause."

About half the states authorize treble or other multiple damages. Sheldon & Carter, *Unfair and Deceptive Acts and Practices*, Nat. Consumer Law Cntr. (6th ed. 2004 and 2005 supp.) §8.4.2.1. "...where actual damages are substantial, the possibility of multiple damages should significantly affect settlement negotiations and a consumer litigants's willingness to press the actions." *Id.* "They are an incentive for a private individual to ferret out deception and bring legal actions, they provide a remedy for those injured, they deter future seller misconduct, and they increase the incentive for the parties to reach a settlement." *Id.* Such "treble damages are not penal, but remedial, and should be liberally construed. There is no merit to a claim that treble damages should be awarded only where actual damages are small." *Id.*

**D. Treble Damages Are Mandatory Under EVEPA.** "The language of such statutes is unambiguously mandatory, such as statements that treble damages 'shall' be awarded." Sheldon & Carter, *Unfair and Deceptive Acts and Practices*, Nat. Consumer Law Cntr. (6th ed. 2004 and 2005 supp.) §4.2.2. This too, comports with Delaware law. *Heil v. Nationwide Mut. Ins. Co.*, 371 A.2d 1077, 1078 (Del. 1977) ("The use of the word "shall" is mandatory and has no room for discretion.); *State v. Ismaaeel* 840 A.2d 644, 652 (Del. Super. Ct. 2004). EVEPA provides that "the victim shall be entitled to recover 3 times the amount of the victim's compensatory damages if a violation of this subchapter is established." 6 *Del. C.* §2583(b).

"If treble damages are proper, the fact that treble damages will result in a

recovery of hundreds of thousands of dollars should not prevent the award. [Consumer protection] cases have trebled a $150,000 award for pain and suffering, awarded multiple damages exceeding $300,000 where an insurer's settlement offer was unreasonably low by $2000, trebled $212,900 actual damages...." *Id.*

This Court must declare that damages from the Lemon Law violation must be trebled as a result of the Elder Victim's Enhanced Penalty Act, as a matter of law.

## CONCLUSION

For the foregoing reasons, this Court must declare the "purchase price" of the 2004 Coach for the purposes of the Lemon Law and the U.C.C. to be $267,730.00.

Moreover, this Court must declare that the Elder Victims' Enhanced Penalty Act applies to this litigation, and will result in trebling of any damages resulting from violation of the Lemon Law or Consumer fraud Act, as a matter of law.

**ERISMAN & CURTIN**

*/s/Christopher J. Curtin*

Christopher J. Curtin
Bar Identification No. 0226
629 Mount Lebanon Road
P.O. Box 250
Wilmington, DE 19899
(302) 478-5577
ccurtin659@aol.com
Attorney for Plaintiffs

DATED: August 18, 2006

32