Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1331776 (Del.Super.)
(Cite as: 2005 WL 1331776 (Del.Super.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
Dorothy E. CLARKSON and Elizabeth F. Dinsmore, Plaintiffs,
v.
Selma GOLDSTEIN in her individual capacity, and on Behalf of the Estate of Louis Goldstein, Defendants.
Selma GOLDSTEIN, Counterclaim Plaintiff,
v.
Dorothy E. CLARKSON and Elizabeth F. Dinsmore, Counterclaim Defendants.
Selma GOLDSTEIN, Third-Party Plaintiff,
v.
ERISMAN & VAN OGTROP, Third-Party Defendant.
**No. Civ.A.04C-03-109MMJ.**

Submitted Feb. 22, 2005.
Decided May 31, 2005.
Deborah I. Gottschalk, Elizabeth Hirst, Community Legal Aid Society, Wilmington, Delaware, for Plaintiffs.

Richard H. Cross, Jr., Mark D. Olivere, Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*

JOHNSTON, J.

\*1 This is an action brought by Plaintiffs Elizabeth F. Dinsmore and Dorothy E. Clarkson alleging claims of fraud, conversion, and violation of the Delaware Prohibited Trade Practices Act ("DPTPA") . [FN1] Plaintiffs seek return of all money paid to Defendants Selma Goldstein and the Estate of Louis Goldstein in excess of the amount Defendants paid, if any, toward the existing mortgage on property located at 1200 West 3rd Street, Wilmington, Delaware ("Property"). Plaintiffs also seek enhanced civil penalties under the DPTPA [FN2] in connection with the sale of the Property. Plaintiffs have moved for summary judgment.

FN1. 6 *Del. C.* §§ 2511 *et seq.*

FN2. 6 *Del. C.* §§ 2580(a), 2581(a).

There are three primary issues raised by Plaintiffs' motion: (1) whether Defendants committed fraud in connection with the alleged sale of the Property to Plaintiffs; (2) whether Defendants committed fraud in connection with the mortgage secured by the Property and listing Selma Goldstein as mortgagee; and (3) whether Plaintiffs are entitled to recover damages for Defendants' alleged violation of the DPTPA. Because there are issues in this case not specifically addressed in Plaintiffs' motion and Defendants' opposition, the Court has determined to treat Plaintiffs' request for relief as a Motion for Partial Summary Judgment.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendants claim that summary judgment is inappropriate in this case because there are factual issues in dispute. Defendants have counterclaimed against Plaintiffs for waste and breach of contract for failure to insure the Property pursuant to the terms of the mortgage, and for failure to make mortgage payments pursuant to the terms of the mortgage. Defendants also have filed third-party claims against the law firm of Erisman and Van Ogtrop.

FACTS AND PROCEDURAL CONTEXT

Mrs. Dinsmore is a 77 year old widow who lives primarily in the downstairs of the Property. Ms. Clarkson is 79 years old and lives primarily in the upstairs of the Property.

In 1983, Mrs. Dinsmore and Ms. Clarkson began renting the Property from Louis and Selma Goldstein. Mr. Goldstein was an attorney who practiced in Wilmington, Delaware. Mr. Goldstein died on March 31, 2004. Mrs. Goldstein is handling the administration of Mr. Goldstein's estate.

The Property was condemned by the City of Wilmington, Department of Licenses and Inspections, in 1990. The "Unfit for Human Habitation Notice," dated October 29, 1990, lists Louis Goldstein as "Agent" for William and Blanche Raisin.

In 1990, Mr. Goldstein approached Plaintiffs about buying the Property. Plaintiffs agreed to buy the Property. The closing was held at the offices of Robert E. Daley, Esquire, [FN3] on December 27, 1990. The only people present at the closing were Mrs. Dinsmore, Ms.

Clarkson, Mr. Goldstein, and Mr. Daley. Mrs. Dinsmore and Ms. Clarkson entered into a mortgage with Mrs. Goldstein, dated December 31, 1990, for $37,500.00 with interest at the rate of 10.75% per year ("Goldstein Mortgage"). The Goldstein Mortgage was secured by the Property.

> FN3. Mr. Daley is deceased. He practiced law with the firm formerly known as Erisman & Van Ogtrop.

*2 At closing, it was revealed that there was an existing mortgage in favor of Bank One Columbus, N.A. ("Bank One Mortgage") [FN4] encumbering the Property. According to Plaintiffs, when Mr. Daley asked Mr. Goldstein about the mortgage, Mr. Goldstein stated that the pre-existing mortgage had nothing to do with the closing.

> FN4. The mortgage originally was held by Mercantile Mortgage Corporation, predecessor in interest to Bank One.

The deed was not recorded until January 22, 1991. The deed conveying the Property to Mrs. Dinsmore and Ms. Clarkson was signed by William L. and Blanche L. Raisin, as sellers, on July 30, 1981, nine and a half years before closing. Mr. and Mrs. Goldstein's names are not listed anywhere on the deed. The Affidavit of Residence signed by Mr. and Mrs. Raisin on July 31, 1981 as sellers does not list Mr. and Mrs. Goldstein as purchasers. The line titled "Name and Address of Purchaser" is blank.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1331776 (Del.Super.)
(Cite as: 2005 WL 1331776 (Del.Super.))

Page 3

Plaintiffs made monthly mortgage payments to Selma Goldstein in amounts of $375.00 or slightly more until 1997. Payments in amounts substantially lower or slightly higher than $375.00 were received by Defendants in 1998, 1999 and 2000. Plaintiffs did not make several monthly mortgage payments between 1998 and 2000. Three payments of $60.00 were received in 2001 and two payments of $100.00 were received in 2002. Eventually, Plaintiffs failed to make a number of payments to Mrs. Goldstein. Mr. Goldstein sent Plaintiffs a delinquency notice dated April 11, 2001.

On or about June 27, 2003, Bank One filed a mortgage foreclosure action against William and Blanche Raisin, Mrs. Dinsmore and Ms. Clarkson ("Foreclosure Proceeding"). [FN5] Plaintiffs served both a response to Bank One and a third-party complaint against Mrs. Goldstein. On March 8, 2004, Plaintiffs filed this separate action against Louis and Selma Goldstein. On March 25, 2004, Plaintiffs moved to stay the Foreclosure Proceeding pending the outcome of this action. The Foreclosure Proceeding was stayed.

FN5. C.A. No. 03L-06-090 MMJ.

At the pretrial conference in this action on September 27, 2004, the Court and counsel for both parties agreed that there were few, if any, material facts in dispute. Rather than go forward with trial scheduled for October 4, 2004, the Court directed Plaintiffs to prepare a Motion for Summary Judgment. A hearing was held on January 7, 2005.

## PLAINTIFFS' CONTENTIONS

Plaintiffs argue that Summary Judgment is appropriate in this case because there are no genuine issues of material fact in dispute. Defendants did not have a valid mortgage with Plaintiffs. Defendants were never owners, nor did they have an equity interest in the Property. Additionally, Defendants' conduct violated Delaware's Prohibited Trade Practices Act.

Plaintiffs are seeking the following relief: (a) the difference between the amount that they paid Defendants, $41,476.00, and the amount that Defendants paid toward the Bank One Mortgage. Defendants provided canceled checks totaling payments of $10,251.16. Thus, Plaintiffs seek the difference of $31,224.84. Plaintiffs argue that the Goldstein Mortgage should be declared void. Defendants never were entitled to any money. Any money that Plaintiffs paid, in excess of what was due to Bank One, was fraudulently induced and should be returned to Plaintiffs.

*3 Plaintiffs request that the Court impose the maximum penalties allowed under Deceptive Trade Practices Act ("DTPA"). [FN6] Section 2533 provides for penalties of $10,000 for each violation of the DTPA, thus a penalty of $10,000 on behalf of each Plaintiff against each Defendant for $40,000. The Act allows for enhanced penalties where the victim is over 65 years old at the time of the fraud. Plaintiff is asking that an additional $10,000 penalty be assessed against each Defendant because Ms. Clarkson was 66 years old in 1990.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1331776 (Del.Super.)
(Cite as: 2005 WL 1331776 (Del.Super.))

Page 4

FN6. 6 *Del. C.* § 2533 (The Deceptive Trade Practices Act is a subchapter of the Prohibited Trade Practices Act).

Plaintiffs contend that in order to establish ownership, Defendants must produce a deed to the Property evidencing the conveyance from the Raisins to the Goldsteins, or must satisfy the Statute of Frauds. [FN7] Such a deed does not exist. The Statute of Frauds can be satisfied through the part performance exception by clear and convincing evidence. Defendants would have to demonstrate two out of three criteria: (1) partial payment; (2) possession; or (3) substantial improvement.

FN7. 6 *Del. C.* § 2714(a).

Plaintiffs assert that Defendants cannot satisfy the Statute of Frauds because they cannot meet any of the three criteria. First, there was no consideration for the Goldsteins' purchase of the Property from the Raisins. Defendants did not make partial payments on the Property. They simply acted as the conduit for rental payments they received from Plaintiffs. Second, preparatory actions, such as making a lease, are not equal to possession. Possession must be actual and physical. Third, the only repair made by the Goldsteins was replacement of a heater after the Property was condemned by the City of Wilmington in 1990. Routine maintenance and small improvements do not rise to the level of substantial improvements.

Plaintiffs contend that there is a presumption of fraud under Delaware law, where there are other ingredients in the case of a suspicious nature, such as gross inadequacy of price. [FN8] In this case, Defendants claim that Plaintiffs took the Property subject to an existing mortgage. However, there was no reduction in the purchase price to reflect the existing lien.

FN8. *Ryan v. Weiner,* 610 A.2d 1377, 1382 (1992).

Mr. Goldstein was engaged in over 200 real estate transactions from 1950 to 2000. Mrs. Goldstein has been involved in over 100 real estate transactions from the similar time period, in her name alone. These transactions include buying and selling property and granting, obtaining and assessing mortgages. In addition, Louis and Selma Goldstein formed several corporations that deal strictly with real estate. Therefore, they were acting in the course of their business or occupation when they conveyed the Property to Plaintiffs.

To prove fraud under the DTPA, Plaintiffs must show: (1) that the Goldsteins provided a fraudulent or negligent misrepresentation; (2) that the Goldsteins acted with reckless indifference to the truth; (3) reliance by Plaintiffs; and (4) actual damages.

Plaintiffs signed a deed for a property that listed Blanche and William Raisin as the sellers. The deed was signed as of 1981 but not recorded until 1990. Mr. Goldstein stated in a letter to Elizabeth Dinsmore dated June 20, 2000:

*4 Mrs. Dinsmore--

You are confused about your mortgage! If you look at your original settlement papers

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1331776 (Del.Super.)
(Cite as: 2005 WL 1331776 (Del.Super.))

Page 5

you will notice that I already had a mortgage of my own on your property. *You* have *nothing* to do with that mortgage company. What you pay me helps me pay off my mortgage to that company. *Your mortgage* is paid to *me*--not any company. If you have any questions, call me. Louis Goldstein [FN9]

> FN9. During the January 7, 1005 hearing, Defendants' counsel stated that although the note is on stationery labeled "From the Desk of Louis Goldstein Attorney," and purportedly signed by Louis Goldstein, the handwriting *is* that of Selma Goldstein.

There are no documents proving ownership of the Property by Louis and Selma Goldstein. Notwithstanding Defendants' knowledge of the recording statute, there is no record of a conveyance from Mr. and Mrs. Raisin to Mr. and Mrs. Goldstein. There is no deed executed pursuant to 25 *Del. C.* § 101. The recorded deed is between the Raisins and Plaintiffs.

Plaintiffs relied on Mr. Goldstein's assurances that the Property belonged to the Goldsteins and that the mortgage existing on the Property was not Plaintiffs' responsibility. This reliance was reasonable because Plaintiffs had a special relationship with Louis Goldstein. Not only was Mr. Goldstein Plaintiffs' landlord, but Mr. Goldstein was a real estate attorney.

Plaintiffs have suffered actual damage. The Property is in foreclosure proceedings and Plaintiffs have paid $40,000 to the Goldsteins

who cannot prove ownership interest in the Property. Damages under the DTPA are the difference between what was paid and the actual value of the Property. In addition, Plaintiffs are seeking enhanced penalties under Section 2582 of the DTPA. An elderly person has the right to seek enhanced penalties if their vulnerability or special relationship caused them to enter into a fraudulent transaction. Ms. Clarkson was 66 at the time she entered into this fraudulent conveyance, had never owned a property before, and was reasonably impaired in her understanding of how the transaction would work. Ms. Clarkson had a trusting relationship with Mr. Goldstein, her landlord and a real estate attorney.

## *DEFENDANTS' CONTENTIONS*

Defendants claim that there are issues of material fact in dispute and, therefore, summary judgment is not appropriate at this stage of the proceedings. The Goldsteins acquired the Property from the Raisins in 1981, subject to the mortgage that the Raisins had obtained from Bank One. Additional consideration for the Property was in the form of improvements, specifically installation of a new furnace in 1990. The new furnace was not routine maintenance and, therefore, constituted consideration.

After July 31, 1981, there is no indication that the Raisins believed they had an interest in the Property. From 1981 until approximately 2000, Defendants paid the Bank One Mortgage.

Defendants assert that they satisfy the Statute

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of Frauds because of the partial payment exception. Defendants made payment on the Bank One Mortgage for approximately 19 years. Defendants further contend that there is no rigid test for satisfying the Statute of Frauds. Part performance is sufficient as it shows that a contract was in fact made.

**\*5** Defendants contend that at the time of the closing, Mr. Daley, the Plaintiffs' attorney, and Plaintiffs signed a document which specifically indicated that there was a first mortgage on the Property held by John Hancock Insurance Company. [FN10] Therefore, Plaintiffs were fully aware that there was a first mortgage on the Property, even though John Hancock Insurance Company never held a mortgage on the Property.

> FN10. It is unclear why John Hancock Insurance Co. was listed as the mortgagee.

Defendants argue that Plaintiffs cannot assert a Deceptive Trade Practices Act claim. The number of real estate transactions in the 1960's or 1970's does not mean that Defendants were in the business of selling real estate in the 1990's. The relevant period is the year before and year after December 31, 1990. The purchase of property does not constitute engagement in the business of selling property. The Goldsteins may have bought property as an investment, acquired property to hold it, or purchased property for transfer to a corporation.

*STANDARD FOR SUMMARY JUDGMENT*

Summary judgment is appropriate when the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. [FN11] In considering the motion, the Court must evaluate the facts in the light most favorable to the non-moving party. [FN12] Summary judgment will not be granted under circumstances where the record reasonably indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. [FN13] When a motion for summary judgment is made and supported as provided in Superior Court Civil Rule 56, the opposing party may not rest on mere allegations or denials. The adverse party must set forth specific facts, by affidavit or otherwise, showing that there is a genuine issue for trial. [FN14]

> FN11. *Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979).

> FN12. *Id.*

> FN13. *Ebersole v. Lowengrub,* 180 A.2d 467, 468-69 (Del.1962).

> FN14. Super. Ct. Civ. R. 56(e).

*ANALYSIS*

At the heart of Plaintiffs' Motion for Partial Summary Judgment is the issue of whether Defendants have acted fraudulently and thereby violated Delaware's Prohibited Trade Practices Act ("PTPA"). [FN15] Section 2513(a) of the PTPA provides in pertinent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1331776 (Del.Super.)
(Cite as: 2005 WL 1331776 (Del.Super.))

Page 7

part:

FN15. 6 *Del. C.* §§ 2501 *et seq.*

The act, use of employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

The term "merchandise" includes "real estate or services." [FN16]

FN16. 6 *Del C.* § 2511(4).

At the time the Property was sold to Plaintiffs, Louis and Selma Goldstein clearly represented themselves to Mrs. Dinsmore and Ms. Clarkson as owners of the Property. If the Goldsteins were not in fact owners of the Property, their representation cannot be construed as anything other than "deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression or omission of [a] material fact."

**\*6** It is equally clear that Plaintiffs relied on the Goldsteins' ownership of the Property in entering into the Goldstein Mortgage. It cannot be disputed that the Goldsteins intended for Plaintiffs to rely upon the Goldsteins' ownership of the Property as an inducement for Plaintiffs to purchase the Property and to make payments pursuant to the Goldstein Mortgage secured by the Property.

## *STATUTE OF FRAUDS*

Delaware's Statute of Frauds provides that any sale of real property must be reduced to writing and signed to be enforceable. [FN17] Defendants have failed to produce any written documentation, in any form, memorializing their alleged purchase of the Property from the Raisins. Instead, the evidence compels the conclusion that the Goldsteins intended to reap the benefits of ownership, without any concurring substantial legal obligations. [FN18] No transfer tax was paid for any transaction between the Raisins and the Goldsteins. Louis Goldstein is listed as "Agent" for purposes of the City of Wilmington's Licenses and Inspections evaluation of the Property that resulted in a finding that the Property was "Unfit for Human Habitation." It is undisputed that the Bank One Mortgage was a Veteran's Administration loan. Such loans require notification upon transfer of title. It is undisputed that no notice was ever provided to the mortgage holder that title was transferred from Mr. and Mrs. Raisin to Mr. and Mrs. Goldstein.

FN17. 6 *Del C.* § 2714(a).

FN18. Defendants' counsel's arguments presented during the January 7, 2005 hearing, support the Court's conclusion:

THE COURT: Well, now, Mr. Cross, if the Court were to find that, in fact, the Goldsteins were the property

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1331776 (Del.Super.)
(Cite as: 2005 WL 1331776 (Del.Super.))

Page 8

owners and then transferred them--transferred that property to the plaintiffs and I would lift the stay on the foreclosure action, shouldn't the proper party--shouldn't I then dismiss the Raisins from the foreclosure action and favorably consider any motion that Bank One would have to substitute Mrs. Goldstein for the Raisins in that foreclosure action?

MR. CROSS: No, Your Honor. An the reason is, it goes back to the fact that the property was taken by the Goldsteins subject to the mortgage. It wasn't--the Goldsteins didn't assume the mortgage. And there is a legal distinction between assuming a mortgage and taking a property subject to a mortgage.

If the Goldsteins had assumed the mortgage, then they are taking personal responsibility for the mortgage, in addition to having the property act as a--just having a lien on the property. When you take a property subject to a mortgage, you don't take any personal liability for it. THE COURT: Are you suggesting that the Raisins had any contemplation that they--that this could ever happen to them, that they would ever be subject to a foreclosure action after that transfer of property from the Raisins to the Goldsteins?

MR. CROSS: I don't--I suppose that is the potential consequence of this.

THE COURT: So it seems like your--your position is that although they owned the property, they were

accepting payments for it, when push comes to shove, they can't have any liability on the mortgage, instead it's the people they bought the property from and the people they sold it to and they're completely out of the loop because they--because Mr. Goldstein failed to record the deed. Don't you think that has a not-so-savory smell to it?

MR. CROSS: Well, Your Honor, I don't think it's because a deed wasn't recorded that leads to that conclusion. A deed could easily be recorded and the property still could have been taken subject to the mortgage.

THE COURT: I agree with that, but, I mean, they would still be affected by the foreclosure. They would still have been listed as a defendant in a foreclosure action, would they not have? Because the only reason that--that the plaintiffs are listed in the foreclosure action is because they're on the deed to the property.

MR. CROSS: I disagree with that, Your Honor. The reasons the Raisins are listed on the foreclosure action is because they signed the mortgage and note taking not only personal responsibility but pledging the home as--for the mortgage- or the mortgage is intended to record the pledge, I guess, for the note. So -

THE COURT: Wouldn't--realistically, wouldn't the Goldsteins have been made defendants in the foreclosure action if their name were on the deed? MR. CROSS: I think they would have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1331776 (Del.Super.)
(Cite as: 2005 WL 1331776 (Del.Super.))

been named because it would be--it would be proper to name anyone who has an interest in the property in the foreclosure action. But I don't think it would change the fact that the Goldsteins would not have had personal liability to the--for example, to the extent the property was lost in foreclosure, that the bank took the property back, it was sold in a foreclosure action and there was a deficiency balance owed-

THE COURT: The bank can only then go against the Raisins -

MR. CROSS: That's correct, that's -

THE COURT:--not against plaintiffs in this action. MR. CROSS: I don't think they can go against plaintiffs in this action.

THE COURT: They loose their -

MR. CROSS: They loose their home, but -

THE COURT:--home -

MR. CROSS: I don't think they have a personal liability.

THE COURT: Correct. Okay. Now, is--for--to the best of your knowledge, were any transfer taxes or other transfer fees paid in the transaction between the Raisins and the Goldsteins? I think at a prior hearing you stated that to the best of your knowledge there were no transfer taxes or other fees paid.

MR. CROSS: To the best of my knowledge, that's correct, there were no transfer taxes paid.

THE COURT: Couldn't it be viewed that Mr. Goldstein and Mrs. Goldstein,

as sophisticated persons with substantial experience in real estate transactions, arranged the transaction which may or may not be legal and appropriate in such a way that they obtained all the benefits of ownership of the property and none of the responsibilities?

MR. CROSS: Well, I don't agree with that, Your Honor.....

January 7, 2005 Transcript, pp. 53-58.

Louis Goldstein was a member of the Delaware Bar, practicing in the area of real property. There is no doubt that Mr. Goldstein was acutely aware of the requirements concerning recording deeds. [FN19] This is not a situation in which the Goldsteins were naive consumers, relying on the closing attorney to perform all of the necessary settlement functions. The only reasonable conclusion to be reached from review of the undisputed material facts is that the Goldsteins intended to convey the Property from the Raisins to Plaintiffs, without ever becoming record owners and in avoidance of payment of transfer taxes and other legal obligations.

FN19. 25 *Del C.* §§ 101, *et seq.*

It is obvious that Selma Goldstein was not a bystander to the transaction. She is the sole named mortgagee of record. She is the actual author of the letter to Mrs. Dinsmore admonishing Mrs Dinsmore: "You are confused about your mortgage! ... *You* have *nothing* to do with that [Bank One] mortgage company."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1331776 (Del.Super.)
(Cite as: 2005 WL 1331776 (Del.Super.))

It is noteworthy that the Goldsteins were careful to record the Goldstein Mortgage in a timely manner to ensure the enforceability of any debt owed to them. In contrast, they neglected to record any deed which would trigger their legal burdens of ownership. This dichotomy is demonstrated by a document signed by Mrs. Dinsmore and Ms. Clarkson dated December 31, 1991. The document is a form of acknowledgment that Plaintiffs were advised by Robert E. Daley, Esquire, the closing attorney, that the mortgage company was "not aware of the transfer of the property" and that Plaintiffs were "relying solely upon Louis Goldstein, Esquire to make the monthly mortgage payment on the ... mortgage."

*7 Defendants assert that the part performance exception to the Statute of Frauds is applicable here. "[P]art performance by a party is regarded as substantial evidence that a contract was in fact made, thereby rendering the policy underlying the Statute of Frauds inapplicable." [FN20] The party claiming the exception must demonstrate part performance by two of three conditions: making payments; taking possession; and/or making substantial improvements. [FN21] The burden is on Defendants to prove that the part performance exception excuses the requirement of written documentation. [FN22]

> FN20. *Taylor v. Jones,* 2002 WL 31926612, at *4 (Del. Ch).

> FN21. *See Houston v. Townsend,* 1 Del. Ch. 416 (1833).

> FN22. *See Shepherd v. Mazzetti,* 545 A.2d 621, 623 (Del.1988); *Hamilton v. Traub,* 51 A.2d 581, 583 (Del. Ch.1947).

There is some limited documentation that the Goldsteins made periodic payments on the Bank One Mortgage. However, such payments are consistent with the Goldsteins' role as conduits or agents through which payments were made on the Bank One Mortgage, for which Mr. and Mrs. Raisin remained legally obligated. There is no evidence that the Goldsteins took actual possession of the Property. The only evidence of improvements is installation of a new furnace in 1990. Therefore, Defendants have failed to prove ownership by part performance in the absence of compliance with the Statute of Frauds.

### DELAWARE'S DECEPTIVE TRADE PRACTICES ACT

A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person engages in conduct that creates a likelihood of confusion or of misunderstanding, or makes deceptive or misleading representations. [FN23] Because of Defendants' failure to comply with the Statute of Frauds, Defendants did not own the Property they purported to sell to Plaintiffs. The Raisins were the legal owners of the Property. By approaching Mrs. Dinsmore and Ms. Clarkson with a proposal to sell the Property to them, the Goldsteins affirmatively misrepresented that they owned the Property. The Goldsteins further reinforced the confusion and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1331776 (Del.Super.)
(Cite as: 2005 WL 1331776 (Del.Super.))

misunderstanding about legal ownership by inducing Plaintiffs to encumber the Property with the Goldstein Mortgage.

> FN23. 6 *Del. C.* § 2532.

The Deceptive Trade Practices Act is not applicable to the sale of real estate. [FN24] The transactions at issue, however, are not the sale of real estate. The Goldsteins implied that they owned the Property in connection with their functional role as the agent for management of the Property, and as the conduit through which payments were made to Bank One. As evidenced by the pending foreclosure proceedings, the Raisins remain legally obligated under the Bank One Mortgage. In short, there was no valid sale of real property in which the Goldsteins were the sellers. Therefore, Defendants should not be shielded from the consequences of their deceptive trade practices by hiding behind a transaction in which they acted not as parties, but as persons providing real estate agent services between the Raisins and Plaintiffs, and providing financing services through the Goldstein Mortgage. While the Deceptive Trace Practices Act does not apply to sales of real estate, the Act does apply to businesses related to real estate that involve the provision of goods and services. [FN25]

> FN24. *Stephenson v. Capano Development, Inc.,* 462 A.2d 1069, 1073 (Del.1983).

> FN25. *State v. Wellington Homes, Inc.,* 2003 WL 22048231, at *3-4 (Del.Super.).

**\*8** As compensation for their services, Defendants caused Plaintiffs to enter into the Goldstein Mortgage, with monthly payments of $375. This amount was calculated as principal of $37,500 and 10.5% interest. The monthly payment amount exceeded the amount of Bank One Mortgage payments by $239 per month.

In order for the Deceptive Trade Practices Act to apply, Defendants must have engaged in deceptive conduct while in the course of a business, vocation, or occupation. Louis Goldstein regularly engaged in real property sales, leases, and conveyances as a party--over 200 transactions from 1950 to 2000. Goldstein has been prosecuted for numerous housing violations or negligence at multiple properties, although he often denied ownership of the properties despite proof of purchase at a sheriff sale and/or record ownership. [FN26] Louis Goldstein was publically disciplined by the Supreme Court for violation of the City of Wilmington Health and Sanitation Code in connection with real estate investments. [FN27] Further, the Supreme Court rebuked Louis Goldstein for discrepancies found in the purchase and sale of property for a secret profit while acting as an attorney for a client in 1951. [FN28] Mrs. Goldstein was personally involved in over 100 real estate transactions from 1950 to 2000, in her name alone. Defendants' assertions that they were not in the real estate business, vocation or occupation, are at best disingenuous. Based on Louis and Selma Goldstein's long history of investment in real estate transactions, Plaintiffs reasonably relied on their assurances

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1331776 (Del.Super.)
(Cite as: 2005 WL 1331776 (Del.Super.))

and misrepresentations concerning ownership, a clear chain of title, and the validity of the mortgage.

> FN26. *See Goldstein v. State of Delaware,* 655 A.2d 307 (Del.1995); *State of Delaware v. Goldstein,* 1992 WL 19981 (Del. Super .); *Goldstein v. Municipal Court for the City of Wilmington,* 1991 WL 53832 (Del.Super.); *Goldstein v. Municipal Court for the City of Wilmington,* 1991 WL 53830 (Del.Super.); *Thomas v. Frank Morris,* 1990 WL 91114 (Del.Super.); *The South Corp. v. City of Wilmington,* 1989 WL 76291 (Del. Ch.); *Goldstein v. City of Wilmington,* 1986 WL 6586, at *1 (Del.Super.).

> FN27. *See In the Matter of a Member of the Bar of the Supreme Court of the State of Delaware: Louis Goldstein,* 698 A.2d 409, 1997 WL 425507 (Del.).

> FN28. *See In re Goldstein,* 85 A.2d 361, 362 (Del.Supr.1951).

## COMMON LAW FRAUD

In order to prove fraud, Plaintiffs must demonstrate: (1) that Defendants either intentionally or recklessly misrepresented a material fact, or concealed such a fact from Plaintiffs at a time when Defendants had a duty to disclose it; (2) that Plaintiffs justifiably relied on Defendants' representation or duty to disclose; and (3) actual damages. [FN29]

> FN29. *Holley v. Jackson,* 158 A.2d 803, 806 (1959).

Defendants failed to disclose that they never signed or recorded a deed reflecting their ownership in the Property. Defendants failed to disclose they had no documentation proving any interest in the Property. For the reasons discussed *inter alia,* Defendants did not have legal ownership of the Property. When persons attempt to sell real property, knowing that they have no title to it, the suppression of such a material fact clearly is fraud. [FN30]

> FN30. *Holley,* 158 A.2d at 807.

The Court cannot resolve at this juncture the issue of whether Plaintiffs are entitled to relief with regard to the Goldstein Mortgage on the basis of fraud. Because Plaintiffs benefitted from residing in the Property, there is insufficient evidence before the Court as to actual damages resulting from paying toward the Goldstein Mortgage. Although the Court finds that Defendants intentionally or recklessly misrepresented or concealed material facts, and that Plaintiffs acted with justifiable reliance in executing the Goldstein Mortgage, genuine issues of material fact remain as to compensatory damages.

## DAMAGES

**\*9** Plaintiffs seek compensatory damages under the Deceptive Trade Practices Act. [FN31] Plaintiffs claim treble damages pursuant to 6 *Del. C.* § 2533(c):

> FN31. *See Roberts v. American*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Warranty Corp.,* 514 A.2d 1132, 1133 (Del.Super.1986) (Members of the consuming public may seek damages for violation of the Act.).

... If damages are awarded to the aggrieved party under the common law or other statutes of this state, such damages awarded shall be treble the amount of actual damages proved.

In this case, the amount of compensatory damages is the Bank One Mortgage payoff amount Plaintiffs' must pay to obtain dismissal of the foreclosure proceedings. Actual damages include attorneys' fees incurred as part of the foreclosure proceedings. Therefore, treble damages are measured as three time the amount of compensatory damages.

In addition, there is a specific statutory authorization for attorneys' fees. Pursuant to 6 *Del. C.* § 2533(b):

The court in exceptional cases may award reasonable attorneys' fees to the prevailing party. Costs or attorneys' fees may be assessed against a defendant only if the court finds that defendant has willfully engaged in a deceptive trade practice.

Because the Court has determined that Defendants have willfully engaged in a deceptive trade practice, attorneys' fees and costs will be assessed.

Enhanced civil penalties apply in this case because Ms. Clarkson was 66 years old, an elder person, [FN32] at the time the prohibited trade practice occurred. [FN33] Section 2582

lists the factors that the Court should consider in determining whether to impose an enhanced civil penalty. The factors include whether the prohibited conduct resulted in any loss of or encumbrance upon a primary residence of the elder person. [FN34] Having found that Defendants' actions resulted in foreclosure proceedings against Ms. Clarkson, with the potential result of loss of or encumbrance upon her primary residence, enhanced civil penalties are warranted. The amount is $10,000 against each defendant.

FN32. 6 *Del. C.* § 2580(a).

FN33. 6 *Del. C.* § 2581(a) provides: If any person is found to have violated any provision of this chapter, and said violation is committed against elder or disabled persons, in addition to any criminal or civil liability otherwise set forth or imposed, the court may impose an additional civil penalty not to exceed $ 10,000 for each violation.

FN34. 6 *Del. C.* § 2582(4)(ii).

## CONCLUSION

Plaintiffs' Motion for Partial Summary Judgment is hereby GRANTED. The Court finds that Louis and Selma Goldstein perpetrated common law fraud against Mrs. Dinsmore and Ms. Clarkson, and that the fraudulent conduct was in violation of Delaware's Prohibited Trade Practices Act, and Delaware's Deceptive Trade Practices Act. Plaintiffs are entitled to: (1) compensatory damages in the amount of Plaintiffs' payoff liability in the Bank One

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1331776 (Del.Super.)
**(Cite as: 2005 WL 1331776 (Del.Super.))**

Page 14

Mortgage foreclosure proceedings, and attorneys' fees incurred as a part of the foreclosure proceedings; (2) enhanced civil penalties pursuant to 6 *Del. C.* § 2581(a) in the amount of $20,000 ($10,000 against each Defendant); (3) treble damages pursuant to 6 *Del. C.* § 2533(c) of three times compensatory damages; and (4) reasonable attorneys' fees pursuant to 6 *Del. C.* § 2533(b).

IT IS SO ORDERED.

* * *

Not Reported in A.2d, 2005 WL 1331776 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1989 WL 214503 (Ohio App. 7 Dist.)
(Cite as: Not Reported in N.E.2d)

Only the Westlaw citation is currently available.
CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.
Court of Appeals of Ohio, Seventh District, Harrison County.
Ronald L. DYER, et al, Plaintiffs-Appellees,
v.
QUALITY CAR & TRUCK LEASING, INC., et al, Defendants-Appellants.
**No. 419.**

June 1, 1989.

Civil Appeal from Harrison County Common Pleas Court, Case No. 17237.

Joan C. Lee, Southeast Ohio Legal Services, New Philadelphia, for plaintiffs-appellees.
Rupert N. Beetham, Cadiz, for defendants-appellants.

Before O'NEILL, P.J., and DONOFRIO and COX, JJ.

## OPINION

O'NEILL, Presiding Judge.

*1 During the month of May 1987, Ronald L. Dyer, a truck driver, approached Quality Car & Truck Leasing, Inc., intending to purchase a new truck. At that time, he was the owner of a 1978 Freightliner which he intended to trade in as a part of his purchase. His intent was to purchase a Hot Shot Truck which was a medium duty truck used for hauling light weight freight. It was less expensive to operate than a larger truck. Steve Knoel, a salesman for Quality Car & Truck Leasing, Inc., convinced Mr. Dyer that rather than purchase the truck outright he should lease it. Mr. Knoel convinced Mr. Dyer that leasing, in addition to the tax deductability factor, was a much better deal for him. In execution of the transaction, Quality Car & Truck Leasing, Inc. took Mr. Dyer's 1978 Freightliner Truck as a trade-in. There was still a balance due on a mortgage in the sum of $5,334.85 on that truck which Quality Car & Truck Leasing, Inc. satisfied. In addition, Mr. Dyer paid Quality Car & Truck Leasing, Inc. the sum of $1,000.00 as a cash downpayment and agreed to make monthly payments thereafter for a period of 48 months, each monthly payment to be in the sum of $613.00. Mr. Dyer testified that he was to pick up the new truck on May 28, 1987 and that, on that date, the truck was to be set up and ready to hook to a trailer. When he picked the truck up, on May 28, 1987, it did not have a fifth wheel and numerous other things were missing. Quality Car & Truck Leasing, Inc. instructed Mr. Dyer to take the truck to Shreve, Ohio, to have the fifth wheel installed. This he did, however, when he arrived in Shreve, Ohio, he was informed by the person who was to install the fifth wheel that he did not have the part needed to place on the truck and that there would be additional time waiting delivery of that part. Mr. Dyer testified that the truck was in Shreve, Ohio approximately two weeks

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1989 WL 214503 (Ohio App. 7 Dist.)
(Cite as: Not Reported in N.E.2d)

Page 2

(Tr. 12). Mr. Dyer picked the truck up sometime toward the end of the second week of June and drove to Grand Rapids, Michigan, for the purpose of picking up a trailer and deliver a pay load. When he arrived in Grand Rapids, Michigan, he found that his new truck was missing brake hoses. He was then compelled to drive back to Shreve, Ohio, to have the missing hoses installed. Mr. Dyer had an arrangement with Independent Freightways, wherein they were to furnish him loads of freight to haul. However, it was necessary that they have a copy of his title to the truck so that they could furnish him with license plates. Quality Car & Truck Leasing, Inc. did not furnish the title to the truck to Mr. Dyer until June 20, 1987. By that time the licenses were placed on his truck and his truck was equipped to use commercially. Mr. Dyer was finally able to pick up his first pay load shortly after July 4, 1987. On July 15, 1987, Mr. Mummert, an agent for Quality Car & Truck Leasing, Inc., contacted Mr. Dyer, bringing to his attention the fact that he had not made the payment which was due July 1, 1987. Mr. Dyer explained to him that he would receive his pay from Independent Freightways the following week and that he would mail the payment as soon as he got paid (Tr. 16.) On July 25, 1987, Mr. Dyer placed in the mail a payment to cover the missing payment along with late charges (Tr. 17). On July 26, 1987, Mr. Mummert came to Mr. Dyer's home and told him that he was there to repossess the truck. Mr. Dyer informed him that he had sent the payment in but Mr. Mummert told him he didn't want any money he just came to get the truck (Tr. 18).

*2 On August 24, 1987, Ronald Dyer and Ruth Dyer filed a complaint naming Quality Car & Truck Leasing, Inc. as the defendant. This complaint essentially alleged that Quality Car and Truck Leasing, Inc. had acted fraudulently in the transaction involving the truck and had caused a great financial loss to the plaintiffs. Following an answer and various motions in proceedings, the case came on for trial to the court on August 4, 1988. On March 3, 1989, the trial judge signed and filed his judgment entry granting judgment against Quality Car & Truck Leasing, Inc. in the amount of $2,298.37 for damages consisting of $1,200.00 for lost income, $1,000.00 loss of the down-payment and equipment expenses of $98.37.

As a part of his findings, the trial judge found:

"This Court finds the Defendant breached the warranty of implied fitness, when it did not deliver the title to the truck for 22 days after possession was given, knowing it could not be used without the title."

"The Court further finds the Defendant breached the warranty of fitness, when it failed to deliver the truck without the necessary brake hoses. * * *."

The foregoing findings by the trial judge are the subject of the appellants' first assignment of error.

The appellant contends that the testimony of Gerald Snider, the largest producer of trailers in the eastern part of the United States, clearly established that brake hoses are an accessory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1989 WL 214503 (Ohio App. 7 Dist.)
(Cite as: Not Reported in N.E.2d)

Page 3

of a trailer and not of a tractor. During direct examination, the following dialogue took place:

"Q. And the brake control for a trailer, is that, in the industry Mr. Snider, an accessory for the truck or an accessory for the trailer?

"A. Normally an accessory for the trailer.

"Q. In other words, the hook-up for a particular trailer goes with that particular trailer.

"A. That's correct." (Tr. 68).

It is rather difficult to accept this as support for custom and usage in the industry in view of subsequent dialogue that took place between the judge and Mr. Snider:

"COURT: Let's assume that from your statement you made that you disconnect from the trailer, assuming you don't own the trailer; picking up trailers here and there and moving them around. When I disconnect from that trailer I believe you said you take those hoses and disconnect them and put them in your tool box.

"A. Correct.

"Q. That be the took (sic) box in the truck?

"A. Might be on the trailer too.

" * * *.

"COURT: So you could find trailers, older

ones with the hoses may still be on but the newer ones would have disconnect, where you disconnect both the trailer and tractor.

"A. That's correct.

"COURT: You say this would be true throughout the industry?

"A. I would say so. I'm the largest manufacturer on the East Coast and I know nearly everybody that builds trailers. They're all my competetors (sic)." (Tr. 75-76).

Mr. Dyer testified that when he was directed by Independent Freightways to pick up a trailer on June 24, 1987, he was unable to pick up that trailer because there were no hoses to hook the brake system on the trailer. He was asked whether hoses for the trailer brake lines go with the truck or the trailer and his response thereto was that brake hoses go with the truck (Tr. 23). It was the trial judge's right to afford weight to the conflicting evidence and accept that evidence which he found to be more plausible. Furthermore, the plaintiff-appellee was purchasing a "Hot Shot" truck which is equipment that is relatively new in the trucking industry. The sellers certainly had superior knowledge to that of the plaintiff-appellee in the equipment which was necessary for the operation of this truck in the trucking industry.

*3 As a part of his findings, the trial judge found that the "lease" executed between the plaintiff-appellee and the appellant was, rather than a lease, a sale and security agreement. This is the subject of the second assignment of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1989 WL 214503 (Ohio App. 7 Dist.)
(Cite as: Not Reported in N.E.2d)

Page 4

error raised by the appellants, wherein they contend that this finding was error on the part of the trial judge.

The lease agreement provided that it was for a term of 48 months with a monthly rental of $613.00 due on June 1, 1987 with subsequent rentals due on the first day of each month thereafter with the final rental being due on May 1, 1991. The lease went on to provide that, upon the termination of the lease, the plaintiff-appellee would have an option to purchase the leased goods at fair market value. R.C. 1301.01(KK) provides, in pertinent part:

" * * * (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

See also 83 Ohio Jurisprudence 3d 94, Secured Transactions, Sec. 73.

This assignment of error is found to be without merit.

As a part of his findings, the trial judge concluded that the defendants-appellants were unjustified under the circumstances in repossessing the truck involved. This is the subject of the appellant's third assignment of error.

The lease in question provided, amongst other things, under paragraph 18, that in the event that the lessee failed to pay in full on the due date of a payment, the lessor had the right to "(b) immediately retake possession of the leased goods without further notice to lessee and without legal proceedings and lessee hereby authorizes and empowers lessor to enter lessee's premises or any other place where such leased goods shall be located and to retake and carry away the same."

Upon the execution of the transaction, the plaintiff-appellee had paid the defendant the sum of $1,000.00 on May 28, 1987 and had also given to them a truck which he owned with a net value of $4,665.15. If this conclusion by the trial judge was error, we cannot find that it had any prejudicial effect as to the final judgment rendered by the trial judge. In arriving at his calculation of damages, the judge assessed no damages as the result of his finding of the unjustified repossession.

Accordingly, this third assignment of error is found to be of no effect.

Assignment of error number four complains that the trial court erred in computing damages recoverable by the plaintiffs-appellees.

As a part of his calculation of damages, the trial judge found, in part:

"Lost income for the period of June 6 through June 29 is set at Twelve Hundred Dollars ($1,200.00). This amount was determined from the invoices for hauling made by the Plaintiff during the period of June 29 through July 24."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1989 WL 214503 (Ohio App. 7 Dist.)
(Cite as: Not Reported in N.E.2d)

Page 5

The total evidence before us reflects a very poor business practice on the part of the defendant-appellant. When they transferred possession of the truck to the plaintiff-appellee and took as a trade-in his truck, the defendant-appellant should have been well aware that plaintiff-appellee intended to use the truck as a business. Because of their practices, the truck was not available to be used from May 28th through June 24th. The transcript of evidence very clearly supports the conclusion that the unavailability of the truck to be used in business was not the responsibility of the plaintiff-appellee. In calculating lost income, the trial judge obviously used, for his calculation, income that the plaintiff-appellee had recovered after he was able to use the truck.

*4 The trial judge further found that:

"The down payment of $1,000.00 is also a damage, since the same was not credited as a rental payment."

The appellant insists that:

"The $10,000.00 was to cover the negative equity he had in the 1978 White Freight Liner that he traded in."

Plaintiffs-appellees' Exhibit 3 clearly reflects that, in execution of this transaction, defendant-appellant had received as a deposit on order the sum of $1,000.00 and had received, as a trade-in, a motor vehicle valued at $10,000.00 with a mortgage thereon of $5,334.85, leaving a balance value of

$4,665.15. It is difficult to conclude, from these calculations, that there was any negative equity in the 1978 White Freight Liner that the plaintiff-appellee had traded in. It all boils down to the fact that, between May 28, 1987 and July 25, 1987, the plaintiff-appellee had paid to the defendant-appellant the sum of $1,000.00 cash, had given them title to a truck with a value of $4,665.15 and had made a payment of $613.00 on the 1st of June, 1987, and, as of July 25, 1987, the plaintiffs-appellees had nothing. As we have previously concluded, and as the trial judge concluded, this loss to the plaintiffs-appellees was the direct responsibility of the defendant-appellant.

The judgment of the trial court, finding for the plaintiffs-appellees in the sum of $2,298.37 and costs in the sum of $78.51, is affirmed.

DONOFRIO and COX, JJ., concur.
Ohio App.,1989.
Dyer v. Quality Car & Truck Leasing, Inc.
Not Reported in N.E.2d, 1989 WL 214503
(Ohio App. 7 Dist.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

884 So.2d 241                                                                                  Page 1
884 So.2d 241, 54 UCC Rep.Serv.2d 435, 29 Fla. L. Weekly D1808
(Cite as: 884 So.2d 241)

remanded.

Briefs and Other Related Documents

Wolf, C.J., concurred in separate written opinion.

District Court of Appeal of Florida,First District.
Anthony E. GRIFFIS and Cynthia Steedley Griffis, Appellants,
v.
LEISURE TYME RV, INC., a corporation; Ron Diemer; Liberty Mutual Insurance Company, a corporation; Commonwealth Bank, a corporation; Newmar Corporation, a corporation; Hartford Accident and Indemnity Company, a corporation, Appellees.
No. 1D02-4387.

Aug. 10, 2004.
Rehearing Denied Oct. 18, 2004.

**Background:** Buyers of recreational motor home brought breach of express warranty action against seller, seller's insurer, manufacturer's insurer, and bank. The Circuit Court, Escambia County, Linda Nobles, J., granted summary judgment in favor of seller, seller's insurer, manufacturer, manufacturer's insurer, and bank. Buyers appealed.

**Holding:** The District Court of Appeal held that genuine issue of material fact existed as to whether pre-delivery inspection form was basis of bargain.

Affirmed in part, reversed in part, and

West Headnotes

**Judgment 228 ☞181(29)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(29) k. Sales Cases in General. Most Cited Cases
Genuine issue of material fact existed as to whether seller's representations on pre-delivery inspection form to make corrections were part of basis of buyers' and seller's bargain, notwithstanding disclaimers that were made at or about same time by dealer, precluding summary judgment in recreational motor home buyers' breach of express warranty action against seller, seller's insurer, manufacturer, manufacturer's insurer, and bank for defective motor home. West's F.S.A. §§ 672.313, 672.316(1).

**\*241** Anthony E. Griffis, Ridgeland, SC, for Appellants.
Fred Tromberg, James A. Kowalski, Jr., and Adam J. Kohl of the Law Offices of Tromberg & Kowalski, Jacksonville, for Appellee Commonwealth Bank. Kimberly A. Ashby of Akerman Senterfitt, Orlando, and W. Scott

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

884 So.2d 241
884 So.2d 241, 54 UCC Rep.Serv.2d 435, 29 Fla. L. Weekly D1808
(Cite as: 884 So.2d 241)

Page 2

Powell of Roth, Powell & Pearson, P.A., Winter Park, for Appellees Newmar Corporation and Hartford Accident and Indemnity Company.

Harry E. Barr and Leslie D. Sheekley of Chesser & Barr, P.A., Shalimar, for Appellees**242** Leisure Tyme, Ron Diemer, and Liberty Mutual Insurance Company.

PER CURIAM.

This is an appeal from a final judgment for the defendants in a civil action arising from the purchase of a recreational vehicle that was alleged to be defective.    The trial court dismissed some of the plaintiffs' claims with prejudice and granted summary judgment for the defendants on others.  For the reasons that follow, we reverse in part and affirm in part.

The plaintiffs, Anthony and Cynthia Griffis, bought a motor home on June 24, 1999, from Leisure Tyme RV, Inc., a dealer in Pensacola.  The purchase agreement provided that the dealer "makes no warranties whatsoever" and "expressly disclaims any implied warranties, including the implied warranties of merchantability or fitness for use."  A few hours after the parties had completed paperwork for the sale, Leisure Tyme presented Mr. Griffis with a "pre-delivery inspection" form (PDI), for which Mr. Griffis paid Leisure Tyme $295.00.    Both parties signed the form, which broadly states, "The selling dealer will inspect, *correct* and adjust as necessary, the following items with the new owner immediately prior to delivery." (emphasis added). All of the specified items included within the product conveyed were checked on the form, including the electrical,

water, plumbing, exterior, and running gear.

Following a series of problems with the motor home, the plaintiffs filed a civil complaint against the dealer, Leisure Tyme, its salesman, Ron Diemer, and its bonding company, Liberty Mutual Insurance Company (collectively "Leisure Tyme");    the manufacturer, Newmar Corporation, and its bonding company, Hartford Accident & Indemnity Company (collectively "Newmar"); and Commonwealth Bank, the financier.  The plaintiffs also sued the manufacturers of various parts and equipment.  Those claims were settled and dismissed and are not part of the present appeal.

The complaint alleged breach of express warranty against Leisure Tyme and Commonwealth Bank (count I); violations of the Magnuson-Moss Warranty Act against Leisure Tyme, Newmar and Commonwealth Bank (count II);    violation of statutory warranty under section 320.835, Florida Statutes (1997) against Leisure Tyme, Newmar and Commonwealth Bank (count III); violations of section 501.204, Florida Statutes (1997), the Florida Deceptive and Unfair Trade Practices Act, against Leisure Tyme and Commonwealth Bank (count IV); fraud and concealment against Leisure Tyme, Newmar and Commonwealth Bank (count V); and revocation of acceptance against Leisure Tyme, Newmar and Commonwealth Bank (count VI).

Newmar moved to dismiss the express warranty and revocation of acceptance claims, and the trial court granted the motion with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prejudice. By a separate order the trial court granted a motion to strike the plaintiffs' motion to compel arbitration of the lemon law claims. The complaint was later amended to add a lemon law claim against Newmar. Subsequently, the trial court granted a summary judgment for the defendants on all of the pending claims.

We conclude that the trial court erred in granting summary judgment for Leisure Tyme on the express warranty and revocation of acceptance claims. The language of the PDI, together with Leisure Tyme's subsequent efforts to make corrections or repairs to the motor home consistent with the PDI in the months following the sale, creates a genuine issue of material fact as to whether the dealer's representations on the PDI to make corrections were part of the basis of the parties' bargain, notwithstanding**243 the disclaimers that were made at or about the same time by the dealer. *See* §§ 672.313, 672.316(1), Fla. Stat. (1997). Leisure Tyme's subsequent attempt to repair the vehicle pursuant to the terms of the PDI raises an issue of fact whether the dealer intended to modify the general disclaimers it also made to the plaintiffs at the time of the sale.

If the evidence supports a finding that the PDI constituted an express warranty, the trial court would also need to determine whether the warranty failed of its essential purpose, so that the buyers would be entitled to invoke all other remedies available under the Uniform Commercial Code, including the remedy of revocation of acceptance as to Leisure Tyme.

Additionally, because there is a factual issue as to whether the PDI was part of the basis of the parties' bargain, there is an issue of whether it constituted a written warranty under the Magnuson-Moss Warranty Act. *See* 15 U.S.C. § 2301(6)(B). Accordingly, the order entering final summary judgment in favor of Leisure Tyme on this claim and the related implied warranty and Florida Deceptive Trade Practices Act claims is reversed.

We affirm the entry of summary judgment in favor of Newmar on the breach of express warranty and lemon law claims, and the order striking the plaintiffs' second request for arbitration under that program. We also affirm the dismissal with prejudice of the claims against manufacturer Newmar for breach of implied warranty under the Magnuson-Moss Warranty Act and for revocation of acceptance.

However, we reverse the dismissal of the breach of statutory warranty claim under section 320.835, Florida Statutes (1997), as to Newmar and the order granting summary judgment for Leisure Tyme on the statutory warranty claim. On this issue, the trial court erroneously found that section 320.835 was inapplicable. The language of section 320.835 is clear and applies to recreational vehicles. The order awarding attorney's fees and costs to Newmar based on the section 320.835 claim is also reversed.

In summary, we affirm all rulings as to Newmar except for the statutory warranty claim. As to Leisure Tyme, we reverse all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

orders entered in its favor, including attorney's fees and costs, except for the ruling on the fraud and concealment claim, which is affirmed. Because we reverse on these claims with respect to Leisure Tyme, we reverse the final summary judgment and award of attorney's fees and costs in favor of Commonwealth Bank, as its sole liability is derivative of and dependent upon a finding of liability as to Leisure Tyme. The order denying the plaintiffs' motion for further inspection and all other orders are affirmed.

Affirmed in part; reversed in part; remanded.

ERVIN and PADOVANO, JJ., concur.
WOLF, C.J., concurs with opinion.
WOLF, C.J., Concurring with opinion.
I write to note that this case may be distinguished from *Claude Nolan Cadillac, Inc. v. Griffin,* 610 So.2d 725 (Fla.App. 1st DCA 1993), and *Frank Griffin Volkswagen, Inc. v. Smith,* 610 So.2d 597 (Fla. 1st DCA 1992), based on the existence of the "pre-delivery inspection form" in this case. I would also note that in both *Claude Nolan* and *Frank Griffin* there were expressed warranties of the manufacturer which do not exist in this case. Thus, those cases are not dispositive as to the claims in the instant case against the manufacturer or the dealer.

Fla.App. 1 Dist.,2004.
Griffis v. Leisure Tyme RV, Inc.
884 So.2d 241, 54 UCC Rep.Serv.2d 435, 29 Fla. L. Weekly D1808

Briefs and Other Related Documents (Back to top)

• 1D02-4387 (Docket) (Oct. 23, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2003 WL 21146720 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Briefs and Other Related Documents
Only the Westlaw citation is currently
available.

United States District Court,D. Delaware.
Douglas HOLLOWAY and Rita Holloway,
Plaintiffs,
v.
MONACO COACH CORPORATION and
Stoltzfus Trailer Sales, Inc., Defendants.
**No. Civ.A. 03-095-SLR.**

May 14, 2003.

MEMORANDUM ORDER

ROBINSON, J.

I. INTRODUCTION

**\*1** On December 18, 2002, plaintiffs Douglas
Holloway and Rita Holloway ("Holloway")
filed this action against defendants Monaco
Coach Corporation and Stoltzfus Trailer
Sales, Inc. ("Monaco") alleging breach of
warranty claims and violation of the Delaware
Lemon Law. The suit was filed in Delaware
Superior Court and removed to this court.
Currently before the court is defendants'
motion to dismiss. (D.I.7) For the reasons
stated below, defendants' motion to dismiss is
denied.

II. BACKGROUND

On October 17, 2000, plaintiffs purchased a
motor home from defendants. Plaintiffs
experienced numerous problems with
allegedly defective brakes. Plaintiffs returned
the motor home for repairs on four different
occasions during the first year of ownership.
These repairs lasted 121 days. According to
plaintiffs the motor home is still not repaired
and the brakes remain defective.

III. STANDARD OF REVIEW

In analyzing a motion to dismiss pursuant to
Fed.R.Civ.P. 12(b)(6), the court must accept
as true all material allegations of the
complaint and it must construe the complaint
in favor of the plaintiff. *See Trump Hotels &
Casino Resorts, Inc. v. Mirage Resorts, Inc.,*
140 F.3d 478, 483 (3d Cir.1998). "A
complaint should be dismissed only if, after
accepting as true all of the facts alleged in the
complaint, and drawing all reasonable
inferences in the plaintiff's favor, no relief
could be granted under any set of facts
consistent with the allegations of the
complaint." *Id.* Claims may be dismissed
pursuant to a Rule 12(b)(6) motion only if the
plaintiff cannot demonstrate any set of facts
that would entitle him to relief. *See Conley v.
Gibson,* 355 U.S. 41, 45-46 (1957). The
moving party has the burden of persuasion.
*See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926
F.2d 1406, 1409 (3d Cir.1991).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21146720 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

## IV. DISCUSSION

Defendants allege that the breach of warranty claims based on the Uniform Commercial Code must be dismissed as the complaint asserts Delaware law. According to the sales contract, any disputes are governed by Pennsylvania law. (D.I. 7, Ex. B at 3) Plaintiffs respond that dismissal is not warranted as both Pennsylvania and Delaware have identical provisions of the Uniform Commercial Code. Defendants do not dispute this, but argue that the application of the law may be different. The court agrees that Pennsylvania law governs the breach of warranty claims. However, defendants have failed to cite to any application of Pennsylvania law that requires dismissal of plaintiffs' claims. As such, defendants' motion to dismiss the breach of warranty claims is denied.

Defendants also assert that the Delaware Lemon Law cannot be applied to this case and, thus, the claims based on the Delaware Lemon Law must be dismissed. The Delaware Lemon Law applies to "any passenger motor vehicle, except motorcycles, which is leased or bought in Delaware or registered by the Division of Motor Vehicles in the Department of Public Safety except the living facilities of motor homes." 6 Del. C. 5001(5). Defendants do not dispute that the motor home was registered by the Division of Motor Vehicles in the Department of Public Safety in the State of Delaware. Further, plaintiffs allege that the dealer prepared the title application, registration and state tax forms for Delaware. Taking these facts as true, the dealer was aware of and assisted in the registration of the motor home in the State of Delaware. Under the plain language of the statute, the Delaware Lemon Law applies to plaintiffs' motor home. Defendants' motion to dismiss the claims based on the Delaware Lemon Law is denied.

## V. CONCLUSION

**\*2** Therefore, at Wilmington this 14th day of May, 2003;

IT IS ORDERED that defendants' motion to dismiss (D.I.7) is denied.

D.Del.,2003.
Holloway v. Monaco Coach Corp.
Not Reported in F.Supp.2d, 2003 WL 21146720 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03CV00095 (Docket) (Jan. 17, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Christopher J. Curtin, Esquire, hereby certify that on August 18, 2006, I electronically

filed the foregoing **Plaintiffs' Motion for Partial Summary Judgment Concerning**

**Recoverable Purchase Price and Elder Victims' Enhanced Penalty Act, Opening Brief and**

**Appendix** in support thereof with the Clerk of the District Court using CM/ECF, which will

send notification of such filing to the following:

Danielle K. Yearick, Esquire
Tybout, Redfearn & Pell
300 Delaware Avenue
11th Floor
Wilmington, DE 19899-2092

Matthew T. Pisano, Esquire
Segal McCambridge
United Plaza
30 S. 17thStreet
Suite1700
Philadelphia, PA 19103

**ERISMAN & CURTIN**

*/s/ Christopher J. Curtin*
Christopher J. Curtin
DE Bar I.D. No.: 226
629 Mount Lebanon Road
Wilmington, Delaware 19803
Phone: (302) 478-5577
Facsimile: (302) 478-5494
eMail: ccurtin659@aol.com
Attorney for Plaintiffs

DATED: August 18, 2006