## WEST'S DELAWARE CODE
## TITLE 6. COMMERCE AND TRADE
## SUBTITLE II. OTHER LAWS RELATING TO COMMERCE AND TRADE
## CHAPTER 50. AUTOMOBILE WARRANTIES

### § 5001. Definitions

As used in this chapter:

(1) "Consumer" means the purchaser, other than for purposes of resale, of an automobile; a person to whom an automobile is transferred during the duration of an express warranty applicable to the automobile; or any other person entitled by the terms of the warranty to enforce the obligations of the warranty.

(2) "Dealer" means a person actively engaged in the business of buying, selling or exchanging automobiles at retail and who has an established place of business.

(3) "Manufacturer" means a person engaged in the business of manufacturing, assembling or distributing automobiles, who will, under normal business conditions during the year, manufacture, assemble or distribute to dealers at least 10 new automobiles.

(4) "Manufacturer's express warranty" or "warranty" means the written warranty of the manufacturer of a new automobile of its condition and fitness for use, including any terms or conditions precedent to the enforcement of obligations under that warranty.

(5) "Automobile" means any passenger motor vehicle, except motorcycles, which is leased or bought in Delaware or registered by the Division of Motor Vehicles in the Department of Public Safety except the living facilities of motor homes.

(6) "Nonconformity" means a defect or condition which substantially impairs the use, value or safety of an automobile.

(7) "Lien" means a security interest in an automobile.

(8) "Lienholder" means a person with a security interest in an automobile pursuant to a lien.

### § 5002. Duty to repair nonconforming automobiles

If a new automobile does not conform to the manufacturer's express warranty, and the consumer reports the nonconformity to the manufacturer or its agent or dealer during the term of the warranty or during the period of 1 year following the date of original delivery of an automobile to the consumer, whichever is earlier, the manufacturer shall make, or arrange with its dealer or agent to make, within a reasonable period of time, all repairs necessary to conform the new automobile to the warranty, notwithstanding that the repairs or corrections are made after the expiration of the term of the warranty or the 1-year period.

### § 5003. Remedies upon failure to repair

(a) If the manufacturer, its agent or its authorized dealer does not conform the automobile to any applicable express warranty by repairing or correcting any nonconformity after a reasonable number of attempts, the manufacturer shall either replace the automobile with a comparable new automobile acceptable to the consumer or repurchase the automobile from the

A00249

consumer and refund to the consumer the full purchase, including all credits and allowances for any trade-in vehicle; provided, however, that the consumer shall have the unqualified right to decline a replacement automobile and to demand instead a repurchase.

(b) In instances in which an automobile is replaced by a manufacturer under this section, said manufacturer shall accept return of the automobile and reimburse the consumer for any incidental costs, including dealer preparation fees, fees for transfer of registration, sales taxes or other charges or fees incurred by the consumer as a result of such replacement. In instances in which an automobile which was financed by the manufacturer or its subsidiary or agent is replaced under this section, said manufacturer, subsidiary or agent shall not require the consumer to enter into any refinancing agreement for a replacement automobile which would create any financial obligations upon such consumer beyond those created by the original financing agreement.

(c) In instances in which a refund is tendered under this section, the manufacturer shall accept return of the automobile from the consumer and shall reimburse the consumer for related purchase costs, including sales taxes, registration fees and dealer preparation fees, less:

(1) a reasonable allowance for the consumer's use of the automobile, not to exceed the full purchase price of the automobile multiplied by a fraction which consists of the number of miles driven before the consumer first reported the nonconformity to the manufacturer, its agent or dealer divided by 100,000 miles; and

(2) a reasonable allowance for damage not attributable to normal wear and tear, but not to include damage resulting from a nonconformity.

(d) Refunds shall be made to the consumer, and lienholder, if any, as their interests may appear.

(e) No authorized dealer shall be held liable by the manufacturer for any refunds or automobile replacements in the absence of evidence indicating that dealership repairs have been carried out in a manner inconsistent with the manufacturer's instructions.

## § 5004. Presumptions

(a) It shall be presumed that a reasonable number of attempts have been undertaken to conform a new automobile to the manufacturer's express warranty if, within the warranty term or during the period of 1 year following the date of original delivery of the motor vehicle to a consumer, whichever is the earlier date:

(1) Substantially the same nonconformity has been subject to repair or correction 4 or more times by the manufacturer, its agents or its dealers and the nonconformity continues to exist; or

(2) The automobile is out of service by reason of repair or correction of a nonconformity by the manufacturer, its agents or its dealers for a cumulative total of more than 30 calendar days since the original delivery of the motor vehicle to the consumer. This 30-day limit shall commence with the first day on which the consumer presents the automobile to the

A 00250

manufacturer, its agent or dealer for service of the nonconformity and a written document describing the nonconformity is prepared by the manufacturer, its agent or dealer. The 30-day limit shall be extended only if repairs cannot be performed due to conditions beyond the control of the manufacturer, its agents or its dealers, including war, invasion, strike, fire, flood or other natural disaster.

(b) The presumption provided in this section shall not apply against a manufacturer unless the manufacturer has received prior direct written notification from or on behalf of the consumer and has had an opportunity to repair or correct the nonconformity; provided, however, that if the manufacturer does not directly attempt or arrange with its dealer or agent to repair or correct the nonconformity, the manufacturer may not defend a claim by a consumer under this chapter on the ground that the agent or dealer failed to properly repair or correct the nonconformity or that the repairs or corrections made by the agent or dealer caused or contributed to the nonconformity.

## § 5005. Costs and attorney's fees in breach of warranty actions

In any court action brought under this chapter by a consumer against the manufacturer of an automobile, or the manufacturer's agent or authorized dealer, based upon the alleged breach of an express warranty made in connection with the sale of such automobile, the court, in its discretion, may award to the plaintiff his costs and reasonable attorney's fees or, if the court determines that the action is brought in bad faith or is frivolous in nature, may award reasonable attorney's fees to the defendant.

## § 5006. Affirmative defense to claim

It shall be an affirmative defense to a claim under this chapter that the alleged nonconformity does not substantially impair the use, value or safety of the new automobile or that the nonconformity is the result of abuse or neglect or of unauthorized modifications or alterations of the new automobile by anyone other than the manufacturer, its agent or dealer.

## § 5007. Informal dispute settlement procedure

(a) If a manufacturer has established an informal settlement procedure that has a certificate or approval by the Division of Consumer Protection, the remedies provided by this chapter shall not be available to any consumer who has not first resorted to such procedure. In the event a manufacturer's informal dispute settlement procedure does not have a certificate of approval from the Division of Consumer Protection, a consumer may immediately and directly seek the remedies provided by this chapter.

(b) The Division of Consumer Protection shall annually evaluate the operation of informal dispute settlement procedures established by manufacturers and shall issue an annual certificate of approval to those manufacturers whose procedures comply with Title 16, Code of Federal Regulations, Part 703 and with subsections (c), (d) and (e) of this section. The Division of Consumer Protection shall suspend the certification of, or decertify, any informal dispute settlement which no longer complies with said provisions.

(c) Any manufacturer who has established an informal settlement procedure shall file with the Division of Consumer Protection a copy of each decision of the informal dispute settlement procedure within 30 days after the decision is rendered.

(d) In order to obtain the certification of the Division of Consumer Protection, a manufacturer's informal dispute settlement procedure shall not convene any informal dispute settlement hearing or meeting outside the State and shall refrain from any practices which:

(1) Delay a decision in any dispute beyond 65 days after the date on which the consumer initially resorts to the informal dispute settlement procedure by written notification that a dispute exists; or

(2) Delay performance of remedies awarded in a settlement beyond 30 days after receipt of notice of the consumer's acceptance of the decision; provided, however, that such time limits shall not include periods of time when the consumer or the consumer's car is unavailable for the remedies specified in the settlement; or

(3) Require the consumer to make the automobile available more than once for inspection by a manufacturer's representative or more than once for repair of the same nonconformity; or

(4) Fail to consider in decisions any remedies provided by this chapter, such remedies to include:

a. Repair, replacement and refund;

b. Reimbursement for related purchase costs; or

(5) Require the consumer to take any action or assume any obligation not specifically authorized under the provisions of Title 16, Code of Federal Regulations, Part 703.

(e) a manufacturer desiring annual certification of an informal dispute settlement procedure shall make application to the Division of Consumer Protection on forms developed by, and shall provide such information as required by, the Division of Consumer Protection.

Amended by 69 L.1993, ch. 291, § 98, eff. July 1, 1994.

### § 5008. Remedies cumulative

Nothing in this chapter shall in any way limit the rights or remedies available to a consumer under Subtitle I of this title.

### § 5009. Enforcement

In addition to any remedies the consumer may have at law or in equity, a violation of this chapter shall be an unlawful practice as defined in § 2513 of this title. The Division of Consumer Protection shall promulgate rules and regulations in order to implement the purposes of this chapter.

Amended by 69 L.1993, ch. 291, § 98, eff. July 1, 1994.

A00252

## 29.  Delaware Elder Victim Enhanced Penalties Act

## DELAWARE CODE ANNOTATED
## TITLE 6. COMMERCE AND TRADE
## SUBTITLE II. OTHER LAWS RELATING TO COMMERCE AND TRADE
## CHAPTER 25. PROHIBITED TRADE PRACTICES
## SUBCHAPTER VIII. ENHANCED PENALTIES WHEN ELDER OR DISABLED
## PERSON TARGETED

### § 2580 Definitions.

(a) "Elder person" means a person who is 65 years of age or older.

(b) "Disabled person" means a person who has a handicap or disability as defined in § 4602 of this title.

(c) "Substantially limits" means substantially interferes with or affects over an extended period of time. Minor temporary ailments or injuries shall not be considered physical or mental impairments which substantially limit a person's major life activities. Examples of minor temporary ailments are colds, influenza or sprains or minor injuries.

(d) "Major life activities" includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.

(69 Del. Laws, c. 151, § 1.)

### § 2581 Civil penalty; disposition of funds.

(a) If any person is found to have violated any provision of this chapter, and said violation is committed against elder or disabled persons, in addition to any criminal or civil penalty otherwise set forth or imposed, the court may impose an additional civil penalty not to exceed $10,000 for each violation.

(b) The civil penalties imposed pursuant to subsection (a) of this section shall be deposited with the State Treasurer and placed into the Consumer Protection Fund as created by § 2527 of this title, shall be subject to appropriation by the General Assembly, and shall be used for the investigation and prosecution of deceptive acts against elder and disabled persons and for consumer education initiatives.

(69 Del. Laws, c. 151, § 1.)

### § 2582 Determination of civil penalty.

In determining whether to impose an enhanced civil penalty under this subchapter and the amount thereof, the court shall consider the extent to which one or more of the following factors are present:

(1) Whether the defendant's conduct was in disregard of the rights of the elder or disabled

A00254

person;

(2) Whether the defendant knew or should have known that the defendant's conduct was directed to an elder person or disabled person;

(3) Whether the elder or disabled person was more vulnerable to the defendant's conduct because of age, poor health, infirmity, impaired understanding, restricted mobility or disability than other persons and whether the elder or disabled person actually suffered substantial physical, emotional or economic damage resulting from the defendant's conduct;

(4) Whether the defendant's conduct caused an elder or disabled person to suffer any of the following:

(i) Mental or emotional anguish;

(ii) Loss of or encumbrance upon a primary residence of the elder or disabled person;

(iii) Loss of or encumbrance upon the elder or disabled person's principal employment or principal source of income;

(iv) Loss of funds received under a pension or retirement plan or a government benefits program;

(v) Loss of property set aside for retirement or for personal or family care and maintenance; or

(vi) Loss of assets essential to the health and welfare of the elder or disabled person.

(5) Any other factors the court deems appropriate.

(69 Del. Laws, c. 151, § 1.)

### § 2583 Cause of action; enhanced penalties.

(a) An elder or disabled person who suffers damage or injury as a result of an offense or violation described in this chapter has a cause of action to recover actual damages, court costs and reasonable attorney's fees.

(b) If a private cause of action is brought by the victim of a violation of this subchapter, and said victim was 65 years of age or older or a disabled person when the violation occurred, the victim shall be entitled to recover 3 times the amount of the victim's compensatory damages if a violation of this subchapter is established. Such treble damages shall be in addition to any other damages to which the victim is entitled pursuant to common law or other provisions of the Delaware Code.

A00255

(c) Restitution ordered pursuant to this section has priority over a civil penalty imposed pursuant to this subchapter.

(69 Del. Laws, c. 151, § 1; 74 Del. Laws, c. 113, §§ 3, 4.)

# 30.  Letter dated March 17, 2006
## to
## Monaco
## Re:  Warranty Limitation

A00257

**ERISMAN & CURTIN**

Christopher J. Curtin
629 Mt. Lebanon Road
Wilmington, DE 19803

Attorneys at Law
P. O. Box 250
Wilmington, Delaware 19899

David H. Erisman
Of Counsel
—

Telephone (302) 478-5577
Telefax (302) 478-5494
E-Mail: CCurtin659@aol.com

March 17, 2006

**By eMail Only**
Matthew T. Pisano, Esq.
Segal, Mc Cambridge, Singer & Mahoney
United Plaza
30 South 17th Street
Philadelphia, PA 19103

### RE: Holloway v. Monaco Coach Corporation, D. Del., C.A. No.: 05-740 JJF

Dear Matt:

I am writing to respond to the defenses that Monaco seems to rely upon, which became apparent during the questioning of the Plaintiff's at their depositions on March 14, 2006. In an effort to make mediation meaningful, Monaco should not rely, or expect us to rely on these illusory defenses.

### The Business Use/Limitation of Warranty Period is Irrelevant.

In short, even assuming the warranty is limited to the first 90 days, all of the breach of warranty/Lemon Law conditions were reported to Monaco or its authorized repair facility within that period. Consequently, the breach of warranty claims continue unchanged, the Lemon Law claim is unaffected, and the Elder Victim Enhanced Penalty claim remains valid.

### The Warranty Limitation Issue.

Monaco apparently argues that because the Holloways use the coach to drive to dog shows where Doug works, the warranty is limited to 90 days as the coach was purchased for "business use," based upon tax records. That interpretation is probably a violation of Florida law,[1] the place where the Automobile was sold, and is probably unreasonable and

---

[1] Florida's mobile home lemon law applies to recreational vehicles and requires the dealer and the manufacturer to warrant the vehicle for at least twelve months. Fla. Stat. Ann. §320.835 (West); *see, Griffis v. Leisure Time RV, Inc.*, 2004 WL 1773513 (Fla. Dist. Ct. App. Aug. 10, 2004 (reversing dismissal of claims against recreational vehicle manufacturer and dealer).

Matthew T. Pisano, Esq.
March 17, 2006
Page 2

unconscionable and thus avoidable under the Uniform Commercial Code.[2]  Regardless of the warranty limitation, it doesn't matter in the present case.

The Limited warranty states:

**"What the Period of Coverage Is**:

If you use your Beaver motorhome only for recreational travel and family camping purposes, the Limited Warranty provided by Beaver ('Warrantor') covers your new motorhome when sold by an authorized dealer, for twelve (12) months from the original retail purchase date or the first 24,000 miles of use, whichever occurs first.  However the limited warranty provided by warrantor covers the steel or aluminum frame structure of the sidewalls (excluding slide outs), roof, and rear and front walls for sixty (60) months from the original retail purchase date or the first 50,000 miles of use, whichever occurs first.

If you use your motorhome for any rental, commercial or business purposes, whatsoever, the Limited Warranty provided by Warrantor covers your new motor home when sold by an authorized dealer for ninety (90) days from the original retail purchase date or the first 24,000 miles, whichever occurs first.  In addition, the Limited Warranty provided by the warrantor covers the steel or aluminum frame structure of the side walls (excluding slide outs), *roof,* and rear and *front walls,* for twelve(12) months from the original retail purchase date or the first 24,000 miles of use, whichever occurs first.  *A conclusive presumption that your motorhome has been used for commercial and/or business purposes arises if you have filed a federal or state income tax form claiming any business tax benefit related to your ownership of the motorhome.*"

The separate chassis warranty contains the same "business use" limitations.  Tab 5.

First, even assuming the "conclusive presumption" is valid, all of the Lemon Law and warranty problem Conditions were brought to the attention of the manufacturer or Monaco's factory authorized dealer in the first three months after 2-15-04 (the date Monaco lists for the warranty start date.)  Using the Monaco warranty start date (*see*, "Owner Inquiry Summary), the 90 days would expire after 5-15-04.  Problems or Conditions reported during the warranty don't

---

[2]The U.C.C. requires reasonableness.  In *J. A. Jones Constr., Co. v. City of Dover*, 372 A.2d 540, (Del. Super. 1977) appeal dismissed, 377 A.2d  1 (Del. Supr. 1977).

Matthew T. Pisano, Esq.
March 17, 2006
Page 3

expire until fixed, under warranty law,[3] and must be repaired in a "reasonable amount of time" under the Lemon Law:

Problems reported prior to 5-15-04 ss documented by the Repair invoices at Tabs 13-14 of Plaintiff's Exhibits book include:

• Tab 13: 3-29-to 4-29-04 (31 days): Body and paint repairs. Paint defects constitute a substantial impairment in new automobiles.[4] This Exhibit included the following paint defects:

1. D/S bottom Fender 3M peeling, (Line Q);

---

[3]It is an elementary rule of warranty law that a manufacturer continues to be responsible for problems brought to its attention during the warranty period, even if they are not fixed when the warranty period expires. *Chrysler Corp. v Wilson Plumbing Co.*, Ga. App., 208 S.E.2d 321 (1974). When a defect within the scope of the express warranty is discovered and brought to warrantor's attention before expiration of the express warranty period, the warrantor must remedy the defect or be liable for breach of the warranty. The express warranty cannot expire for unrepaired or unsuccessfully repaired problems. *Lieb v. Milen*, N.M. Ct. App., 30 U.C.C. Rep. 112 (1980) (A one-year warranty was held not to be the statute of limitations the buyer of a van could sue the seller after the one-year period expired because defects were brought to the attention of the seller during the warranty period.)

[4]Courts consistently hold that defective paint on a new Automobile is a breach of the manufacturer's express written warranty as well as the implied warranty of merchantability, justifying revocation of acceptance under the Uniform Commercial Code. *Pavesi v. Ford Motor Co.*, 383 A. 2d 954 (N.J. Ch., 1978) (Defective paint was substantial impairment that allowed UCC revocation of acceptance.); *In re Ford Motor Co., Vehicle Paint Litig.*, 1996 U.S. Dist. Lexis 11063 (E.D. La. July 30, 1996); *Check v. Clifford Chrysler-Plymouth*, 794 N.E. 2d 829 (Ill. App. 2003). Moreover, cases decided under various Lemon Laws, conclude that defective paint is a breach of the manufacturer's warranty that substantially impairs the value of a new automobile. "One court has found a defective paint job to be a substantial impairment even if the paint job could be easily fixed. Sheldon & Carter, *Consumer Warranty Law*, §13.2.4.4 (2nd ed. 2001) citing: *Williams v. Chrysler Corp.*, 530 So 2d 1214 (La. App., 1988), *accord, General Motors v. Dohmann,* 722 A.2d 1205 (Conn., 1998) (Defective paint job is a substantial impairment on the basis of the consumers' testimony and expert testimony.) *See also, Russo v. Danbury Auto Haus, Inc.*, 1994 Conn. Super., Lexis 1526 (June 10, 1994); *Dieter v. Chrysler Corp.*, 610 N.W. 2d 832 (Wis. 2000) (Buyers entitled to repurchase remedy when dealer's attempts to repaint left swirls in the finish.); *O'Bryant v. Reeder Chevrolet, Co., Inc.*, 1999 Tenn. App. Lexis 245 (April 15, 1999) (A ding in a new car costing $200.00 to repair could be a substantial impairment when repainting was rough, and did not match.)

A00260

Matthew T. Pisano, Esq.
March 17, 2006
Page 4

2. Paint runs at geni door, (Line S);
3. Ripples in fiberglass at center of entry door (Line T);
4. Scratch and chip in paint below entry door window (Line U)
5. Paint chip to the left of the entry door (Line v);
6. Rough paint in black stripe to the left of the P/S fuel door (Line W);
7. Peeling paint at the bottom of P/S slide opening (Line X)
8. Repair Rough edges on paint of P/S belt molding (Line Y);
9. Peeling clear at P/S slide below belt (Line Z);
10. Rough edges of stripes (Line AA);
11. Scratch in P/S slide out belt molding (Line AB);
12. Scratch on lower edge of P/S #3 storage door (Line AC);
13. Rough stripe edges on thin panel (Line AD);
14. Scratch in belt molding behind P/S slide front, (Line AE);
15. Paint imperfection on P/S belt molding, (Line AF);
16. Rough stripe edges on P/S black stripe above rear wheel, (Line AG);
17. Rough stripe edges on P/S bedroom slide above wheel, (Line AH);
18. Imperfection in paint at #6 storage door at top under belt (Line AI);
19. Peeling paint at D/S belt molding above elect stor door, (Line AJ);
20. Scratches at cord storage door, (Line AK);
21. Out ding, paint not broken on #5 storage door rear, (Line AL);
22. Peeling clear at belt molding above #5 storage door on D/S, (Line AM);
23. Very rough stripe edges on #3 D/S storage door, (Line AN)
24. Peeling paint at hinge above D/S #3 storage door, (Line AO);
25. Scratch at #2 D/S storage door, (Line AP);
26. Bulge in fiberglass of the sidewall over #2 storage door is in shape of a "V" (Line AQ);
27. Outward bulge in front D/S sidewall panel, (Line AR);
28. Scratches at D/S fuel door; (Line AS);
29. Rough strip edges on D/S belt molding, (Line AT).

• Tab 14: 5-4-04: Includes reports of the following Lemon Law (non "living facility") problems with the Automobile):

• Diesel fuel leaking from top of fuel tank[5];

_____

[5]A persistent leak of fuel is a substantial impairment to the use, value, or safety of an automobile. *Safari Motor Coaches, Inc., v. Corwin*, 638 N.Y.S. 2d 992 (N.Y. App. Div. 1992), Sheldon & Carter, *Consumer Warranty Law*, (2nd ed. 2001and 2004 cum. supp.) §13.2.4.4.3.

Matthew T. Pisano, Esq.
March 17, 2006
Page 5

- Water leak[6] into passenger side storage compartment (its not "living facility" per Lemon Law definition of covered "Automobile" §5001 (5));

- Roof [7]leaking water inside the coaches.[8]
- Water stains on ceiling;
- Wooded ceiling trim strips warped due to water due to roof drips;

- Diesel fumes in coach;[9]

---

[6]It is clear that water leaking into the passenger compartment of an automobile substantially impairs the use, value, or safety of the Automobile. In *Beal v. Volkswagen of America, Inc.*, 1987 WL 642748 (Del.Com.Pl. Mar 25, 1987), a Delaware court held that a leak that allowed water to enter the passenger compartment during some rain storms substantially impaired the value of the vehicle. Water leaking into the passenger compartment of a passenger automobile was also judicially recognized to constitute a breach of warranty, justifying cancellation of the sale and other damages in *Charney v. Ocean Pontiac, Inc.*, 17 U.C.C. Rep. 982 (Mass. Dist. Ct. 1975). Similarly, Sheldon & Carter, *supra.*, note that "Water leaks into the living quarters of a motor home substantially impair the vehicle." *Eslamieh v. Coachmen Recreational Vehicle*, 2003 WL 22718870 (Cal Ct. App. November 19, 2003) (California Lemon Law excludes living facilities). In the present case, water from the leaking roof ran down the windshield, which is in the driver's area, not in the "living facilities." *Barker v. Fleetwood Enterprises, Inc.*, 2002 WL45391 (Cal. Ct. App. Mar. 26, 3003; *Lesjack v. Forest River, Inc.*, 2003 WL 22861722 (Ohio Ct. App. Nov. 26, 2003). Note also, that the roof was the source of the leak, and it is warranty for 12 months. Tab 5.

[7]Even under the restrictions of the "commercial use" limitation the "roof, and...front walls" are warranted for the first 12 months or 24,000 miles. Tab 5.

[8] "Persistent roof leaks were sufficient to entitle a buyer to return a motor home for a refund under Louisiana's Civil Code. *Carpenter v. Lafayette Woodworks, Inc.*, 635 So. 2d 1187 (La. Ct. App. 1995)." *Sheldon & Carter, id.*, §13.7b.4 (2005 cum. supp.) Again, in the present case, water from the leaking roof ran down the windshield. "A New York appellate court upheld a lemon law award when the defect was a leak in the upper corner of the windshield. *Gen. Motors Corp., v. Lee*, 598 N.Y.S. 2d 61 (1993)." *Sheldon & Carter, id.*, § 13.2.4.4.3. *Milicevic v. Mercedes-Benz, U.S.A. Ltd. Liab.* Co., 256 F. Supp. 2d 1168 (D. Nev. 2003) (defective weather stripping around windows, and other faults.) *Browning v. Am. Isuzu Motors, Inc.*, 2002 WL 32063978 (Ohio C.P. Mar. 21, 2003) (whether persistent leaks which may have caused electrical problems are a substantial impairment is a fact question to be decided at trial.); *Regal v. Gen Motors Corp.*, 2003 WL 21537821 (Wis. Ct. App. July 9, 2003).

[9]Courts consistently hold that a foul smell in a new car is a breach of the manufacturer's express written warranty, justifying revocation of acceptance under the Uniform Commercial

A00262

Matthew T. Pisano, Esq.
March 17, 2006
Page 6

  • Coach hits extremely hard on bumps.[10]

In short, by April 29, 2004, the Automobile had been out of service for repairs 31 days
for paint etc., satisfying the Delaware Lemon Law presumption. In addition, before the
expiration of 90 days from 2-15-04, the roof leak, diesel fuel blow back and difficulty filling,
interior diesel smell, and bad suspension were reported to the dealer or manufacturer. These
were not repaired in a reasonable amount of time or a reasonable number of attempts, as detailed
in our Notice letter, and in violation of the Lemon Law.

The Delaware Lemon Law requires only that the "Condition" be reported during the
warranty period:

"**§ 5002. Duty to repair nonconforming automobiles**

**If a new automobile does not conform to the manufacturer's express
warranty,** and **the consumer reports the nonconformity to the manufacturer
or its agent or dealer *during the term of the warranty*** or during the period of 1
year following the date of original delivery of an automobile to the consumer,
whichever is earlier, **the manufacturer shall make, or arrange with its dealer
or agent to make, within a reasonable period of time, all repairs necessary to
conform the new automobile to the warranty, *notwithstanding that the repairs
or corrections are made after the expiration of the term of the warranty*** or the
1-year period." Emphases added.

The above enumerated Conditions were reported within the Lemon Law reporting period,
even assuming it is limited to 90 days. Monaco then had a reasonable opportunity to make
repairs. But by December, 2004 Monaco failed to repair these and other Conditions. On 12-16-
04 the Holloways demanded their Lemon Law remedies in writing, Tab 22. The Lemon Law
violation then accrued, and Rita was already 65, since June 2, 2004. Tab 6. Monaco's refusal to
honor the accrued Lemon Law rights is, as a matter of law, a violation of 6 *Del. C.* §2513, which
brings it within the Elder Victims Enhanced Penalty Act, as explained in our Notice letter.

---

Code. Sheldon & Carter, *Consumer Warranty Law*, §13.2.4.4.3 (2nd ed. 2001and 2004 cum.
supp.) "*Odors.* A Washington Court held that an odor of diesel fuel in a carpeted storage area of
a motor home was a 'substantial impairment.' *Moobery v. Magnum Mfg., Inc.*, 32 P. 3d 302,
(Wash. App. 2001); *see also Lundy v. Ford Motor Co.*, 104 Cal. Rptr 2d 545 (Cal. App. 2001)
(whether odor was substantial impairment was a jury question.)"

[10]*Cannon v. Newmar Corp.*, 287 F. Supp. 2d 222 (W.D.N.Y. 2003) (granting summary
judgment to buyers under lemon law where motorhome had, in addition to other problems, a
faulty air suspension system.)

Matthew T. Pisano, Esq.
March 17, 2006
Page 7

### Monaco Is Not Entitled to a Credit in the Amount of the "Trade-in."

During the deposition of Mr. Holloway, questions suggested that Monaco feels that it is entitled to claim as a credit, the "trade-in" value of the 2001 Coach, listed as \$122,000 on the loan document. Tab 2, line 2 "Total Down payment = Net Trade-in \$122,633.23 = cash down \$25,500.00...My trade in is a ...2001...." Of course, that is preposterous.

The settlement agreement required return of the 2001 coach as part of the settlement. It was in fact returned to Monaco on January 11, 2004. The Holloways had, in fact, paid Monaco in full for that coach, by paying the proceeds of a purchase loan for that coach, and paying a third party lender payments over time. Monaco was paid in full for the 2001 coach. Monaco did not even pay off the lien on the 2001, since the new coach was substituted as collateral for the old coach on the loan, under the Settlement Agreement, ¶2.1 (h), before the Holloways refinanced to take advantage of declining interest rates, with a second third-party lender. It is irrational, therefore, that Monaco would take the 2001 coach in "trade" then take, in addition to the coach, the value of the coach. It is also contrary to the law as discussed in our Notice letter, as well as the Lemon Law.

The Delaware Lemon Law, in a "repurchase"situation requires the Manufacturer to pay the consumer for the value of the trade-in:

#### "§ 5003. Remedies upon failure to repair.

(a)....repurchase the automobile from the consumer and *refund to the consumer the full purchase, including all credits and allowances for any trade-in vehicle*; provided, however, that the consumer shall have the unqualified right to decline a replacement automobile and to demand instead a repurchase.

\*\*\*

(c) In instances in which a refund is tendered under this section, the manufacturer shall accept return of the automobile from the consumer and shall reimburse the consumer for related purchase costs, including sales taxes, registration fees and dealer preparation fees, less:

(1) a reasonable allowance for the consumer's use of the automobile, not to exceed the full purchase price of the automobile multiplied by a fraction which consists of the number of miles driven before the consumer first reported the nonconformity to the manufacturer, its agent or dealer divided by 100,000

A 00264

Matthew T. Pisano, Esq.
March 17, 2006
Page 8

miles..."[11] Emphases added.

Thus, Monaco's claim for the value of the trade-in is without logic, or legal support, or if there is any legal support, it is in conflict with the Delaware Lemon Law.

The 2001 coach returned to Monaco, in fact, had trade in value. The NADA "Bluebook" Recreational Vehicle Appraisal Guide for February 2004, is unavailable. However, the same Guide for January to February *2005*, one year after Monaco acquired the 2001 coach, shows that its retail value for an average Beaver Monterey Seacliff with 2 slide outs was $122,040, a figure remarkably similar to the amount Monaco claims in addition to the coach as a credit. Presumably, it would be worth more in 2004, as it would be one year newer. Monaco suffered no loss, and cannot claim the value of the traded coach.

Moreover, there was additional consideration for the "trade-in" of the 2001 coach that the Holloways gave to Monaco. The Settlement Agreement document (Tab 2), which was prepared by Monaco's attorneys, says that the settlement is in consideration for the resolution of the prior case. The Consideration for the Settlement includes:

¶2.1 Agreement that the settlement consideration is acceptable to resolve claims valued by Plaintiff at over $302,000;

2.1 (a) *Surrender of the 2001 coach*, free and clear of liens, and in good condition;

2.1 (b) The Holloways sign a Power of Attorney;

2.1 (h) The Holloways must cooperate in *substituting the new coach as collateral on the purchase loan*, through the third party lender;

2.1 (j) The Holloways must cancel the service contract on the 2001 coach with the refund going to Monaco;

2.1 (n) The Holloways had to agree "to assist, cooperate and participate in the prosecution of any claims brought by Monaco Coach Corporation against any entity deemed in Monaco's exclusive judgement, to be in any way responsible for damages, fees or costs incurred by Monaco as a result of the circumstances of the claim" concerning the 2001 coach;

---

[11]We accept the allowance for use as a deduction from the purchase price. The mileage difference between when the coach was purchased and when the problems were first reported are 3,423 (Tab5) -3,436 (Tab 13) a difference of 13 miles /100,000 miles x $267,730.00 = $34.80.

A00265

Matthew T. Pisano, Esq.
March 17, 2006
Page 9

> 3. The Holloways had to release all their claims against Monaco. "In further
> consideration of the agreement and covenants contained in section 2
> ...Claimant hereby releases and forever discharges Monaco *and Dealer* of all
> claims of any nature whatsoever...."

Monaco was given the coach and other "good and valuable consideration." As a
consequence Monaco does not have claim on the trade-in value of the old coach.

### Extended Warranty/implied Warranty

Questioning of Douglas Holloway suggested that Monaco is claiming that there is no
extended warranty on the new Automobile. A service contract, of course is a contract which
extends the duration of the implied warranty of merchantability.[12] Monaco's position will assist
the Plaintiffs at trial to demonstrate the duplicity of Monaco.

Monaco is contractually bound as part of the Settlement Agreement to purchase a service
contract for the Holloways, apparently did not, and now wants to use its own breach of contract
to limit the warranty. A judge will never allow that, and neither will a jury.

The Settlement Agreement states at Tab 2, ¶2.1 "(j) Monaco agrees to purchase for the
Claimants benefit a 7 year extended warranty/Service contract covering the 2004 Motorhome."
As the questioning of Mr. Holloway demonstrated, no evidence of that purchase has been
forwarded by Monaco despite this contractual obligation.

We demand that the service contract be provided immediately.

Please do not hesitate to contact me if you would like to discuss any aspect of this matter.

Very truly yours,

/s/*Christopher J. Curtin*
Christopher J. Curtin

cc: Mr. & Mrs. Holloway
Danielle Yearick, Esq., by eMail only

---

[12]15 *U.S.C.* 2308(a) and (b); Sheldon & Carter, *Consumer Warranty Law*, §2.3.2.3.

A00266

## 31.  Excerpt from Report of Defense Expert David Stivers

A00267

# DOUGLAS & RITA HOLLOWAY

# vs.

# MONACO COACH CORPORATION

In The United States District Court, District Of Delaware

civil case no. 05 - 740 (JJF)

# EXPERT REPORT

# OF

# R.V. EXCHANGE TRANSACTION

by David A. Stivers

* * *

**PAGES OMITTED
after this page**

A00268

# O P I N I O N S

These are my expert opinions, based upon a reasonable degree of certainty and expertise in the study of retail automobile and recreational vehicle transactions:

1. By providing Mr. & Mrs. Holloway with a replacement recreational vehicle, Monaco Coach Corporation (hereinafter "Monaco") absorbed the depreciation, that occurs over time and when it changes its title status from "new" to "used", in the fair market value of the 2001 Beaver Monterey Seacliff.

2. Monaco's offer of a replacement RV saved these consumers $134,302.82. Excellent examples of the losses that the Holloways would have otherwise incurred include vehicle depreciation and inflated finance charges they were already obligated to pay on the 2001 Beaver Monterey Seacliff they traded in, including the time value of money that the retailing dealer and assigned lender were demanding in the October 17, 2000 installment loan contract.

* * *
**PAGES OMITTED
after this page**

A00269

Examples of some numerical cost components in the January 10, 2004 installment loan include:

| | |
|---|---|
| $267,730.00 | sale price of 2004 Beaver Monterey |
| $0 | sales tax |
| 5.50 % | interest rate Mr. & Mrs. Holloway were charged |
| 240 | term of loan (expressed in months) |
| $827.47 | monthly payment amount |
| $148,133.23 | downpayment (including trade equity or rebate) |
| $0 | service contract(s) |
| $145,096.77 | pay-off due on the trade-in vehicle (2001 RV) |
| $420.35 | documentary stamps (a Florida tax on loans) |
| $0 | government fees and other non-dealer fees |
| $78,575.68 | finance charge |
| $120,017.12 | amount financed |
| $198,592.80 | total of payments |
| $346,726.03 | total sale price |

The auto sales industry and our government share a common definition of "fair market value", when viewing negotiation and outcome of a vehicle sale. According to the Internal Revenue Service (paraphrasing), the fair market value is the price at which the property would change hands between a willing buyer and a willing seller, when neither has the compulsion to buy or sell, and when both have reasonable knowledge of relevant facts:

U.S. Treasury Regulation  1.170-1(c).

\* \* \*

**PAGES OMITTED
after this page**

 A00270

## 32.  Monaco Warranty Claim History

A00271

Warranty Claim History

Lazy
Days
Service
Ctr.(S06)

(FLOOR COVERINGS / CARPET, FLOOR / REPAIR / LOOSE / )

**Repair Started:** 10/26/04

**Repair Completed:** 12/17/04

FLOOR COVERINGS / CARPET, FLOOR / REPAIR / LOOSE /, Complaint: Customer states bedroom carpet at rear foot of bed on step up to closet coming loose, Cause: adhesive failure, Correction: install staples, test

---

**Job Op Code: 00  D6  13  55  NP**        80063321  9  80063321  Tampa /        22223        $0.00        $22.50
Lazy
Days
Service
Ctr.(S06)

(INTERNAL CODES / CHASSIS LUBE/OIL/FILTER / NO REPAIR / NO FAILURE / NON PUBLISHED INTERNAL CODE)

**Repair Started:** 10/26/04

**Repair Completed:** 12/17/04

INTERNAL CODES / CHASSIS LUBE/OIL/FILTER / NO REPAIR / NO FAILURE / NON PUBLISHED INTERNAL CODE, Complaint: Customer states still leaking diesel onto genset exhaust, Cause: oil blow by from generator, Correction: check system, found bottom of geni wet w/ oil, ck. level, 1 qt. low, geni access door would not operate- bolt welded to frame, modify bolt for proper operation, geni hours 952 w/ out service, oil thin, blow by dripping on exhaust. service geni

---

**Job Op Code: 00  D7  13  55  NP**        80063321  10  80063321  Tampa /        22223        $0.00        $40.00
Lazy
Days
Service
Ctr.(S06)

(INTERNAL CODES / FUEL GOODWILL EXPENSE / NO REPAIR / NO FAILURE / NON PUBLISHED INTERNAL CODE)

**Repair Started:** 10/26/04

**Repair Completed:** 12/17/04

INTERNAL CODES / FUEL GOODWILL EXPENSE / NO REPAIR / NO FAILURE / NON PUBLISHED INTERNAL CODE, Complaint: Customer states fuel is forced out of both sides when fuel filling, Cause: no problem found, Correction: inspect all hoses, take coach to T/A to fill w/ diesel, fill tanks, no problem found

---

**Job Op Code: 01  K1  01  25**        80063321  11  80063321  Tampa /        22223        $0.00        $52.50
Lazy
Days
Service
Ctr.(S06)

(CHASSIS, 1 YEAR 24,000 MI WARR / RIDE HEIGHT / REPAIR / MISADJUSTED / )

**Repair Started:** 10/26/04

**Repair Completed:** 12/17/04

CHASSIS, 1 YEAR 24,000 MI WARR / RIDE HEIGHT / REPAIR / MISADJUSTED /, Complaint: Customer states coach has harsh ride over bumps, Cause: ride height slightly off, Correction: check shock and air bags, found ride height front 1/2" off at 9 1/2", set to 10", test drive good, coach has slight tire vibration

---

**Job Op Code: 23  00  01  56  NP**        80063321  12  80063321  Tampa /        22223        $0.00        $25.00
Lazy
Days
Service
Ctr.(S06)

(RO SYSTEM CUSTOMER PAY / MISC NON T/A REPORTABLE REPAIR / REPAIR / MISC. PROBLEM / NON PUBLISHED INTERNAL CODE)

**Repair Started:** 10/26/04

**Repair Completed:** 12/17/04

RO SYSTEM CUSTOMER PAY / MISC NON T/A REPORTABLE REPAIR / REPAIR / MISC. PROBLEM / NON PUBLISHED INTERNAL CODE, Complaint: Customer states dash oil guage is reacting to tach, Cause: no problem found, could not duplicate, Correction: test system, disconnect tach signal wire, verify oil pressure guage rises w/ engine rpm, disconnect tach and oil pressure guage, no difference, coach operating as per design, oil pressure does rise when engine revved due to greater volume of oil

A00272

**Job Op Code: 10  41  13  55  NP**

80063321 13 80063321 Tampa / Lazy Days Service Ctr.(S06)    22223    $0.00    $5.00

(DOORS (ALL DOORS) / DIAGNOSTIC, ENTRY/DRIVER DOOR / NO REPAIR / NO FAILURE / NON PUBLISHED INTERNAL CODE)

**Repair Started:** 10/26/04

**Repair Completed:** 12/17/04

DOORS (ALL DOORS) / DIAGNOSTIC, ENTRY/DRIVER DOOR / NO REPAIR / NO FAILURE / NON PUBLISHED INTERNAL CODE, Complaint: Customer states entry door hard to close, must slam, Cause: no problem found , could not duplicate, Correction: test door several times, door closes and opens easily

---

**Job Op Code: 21  95  02  43  PR**

80063321 14 80063321 Tampa / Lazy Days Service Ctr.(S06)    22223    $0.00    $37.50

(ACCESSORIES / MOTOR, ELEC PATIO AWNING / REPLACE / COMPONENT DEFECT / PART RETURN)

**Repair Started:** 10/26/04

**Repair Completed:** 12/17/04

ACCESSORIES / MOTOR, ELEC PATIO AWNING / REPLACE / COMPONENT DEFECT / PART RETURN, Complaint: Customer states entry door awning is inop, Cause: water in motor, Correction: get awning open to access screws, remove awning, remove and replace motor assy, reinstall all, test, Comment: mod / ser. 2040263643

MONACO I 21601665.0: CAREFREE QL13ABJB

---

**Job Op Code: 04  C2  13  55  NP**

80063321 15 80063321 Tampa / Lazy Days Service Ctr.(S06)    22223    $0.00    $35.00

(EXTERIOR / DIAGNOSTIC, SLIDE OUT ROOMS / NO REPAIR / NO FAILURE / NON PUBLISHED INTERNAL CODE)

**Repair Started:** 10/26/04

**Repair Completed:** 12/17/04

EXTERIOR / DIAGNOSTIC, SLIDE OUT ROOMS / NO REPAIR / NO FAILURE / NON PUBLISHED INTERNAL CODE, Complaint: Customer states d/s slide doesn't fit tight, Cause: could not duplicate, Correction: crank coach, bring air to ride height, test slide several times, slide is properly sealed and does not leak, apply silicone to seals, test again, could not duplicate customer complaint

---

**Job Op Code: 04  10  01  24**

80063321 16 80063321 Tampa / Lazy Days Service Ctr.(S06)    22223    $0.00    $20.00

(EXTERIOR / DOOR, BAGG COMPARTMENT / REPAIR / MISALIGNED / )

**Repair Started:** 10/26/04

**Repair Completed:** 12/17/04

EXTERIOR / DOOR, BAGG COMPARTMENT / REPAIR / MISALIGNED / , Complaint: Customer states small comp. p/s behind rear wheel fills w/ rain water, Cause: out of adjustment, Correction: adjust door to fit tight against seal, smoke test and water test, no leaks found

---

**Job Op Code: 00  C1  13  55  NP**

80063321 17 80063321 Tampa / Lazy Days Service Ctr.(S06)    22223    $0.00    $17.50

(INTERNAL CODES / LPG LEAK TEST / NO REPAIR / NO FAILURE / NON

INTERNAL CODES / LPG LEAK TEST / NO REPAIR / NO FAILURE / NON PUBLISHED INTERNAL CODE, Complaint: Customer states 2

A00273