IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

DOUGLAS HOLLOWAY and RITA  :
HOLLOWAY,                  :
                           : Civil Action
    Plaintiffs,          : No. 05-740 (JJF)
                           :
    vs.                  :
                           :
MONACO COACH CORPORATION,  :
                           :
    Defendant.           :

- - -

        Deposition of DOUGLAS HOLLOWAY, taken pursuant to notice before Gail Inghram Verbano, CSR, RMR, in the law offices of Tybout, Redfearn & Pell, 750 South Madison Street, Suite 400, Wilmington, Delaware, on Tuesday, March 14, 2006, beginning at approximately 8:55 a.m., there being present:

APPEARANCES:

        CHRISTOPHER J. CURTIN, ESQ.
        ERISMAN & CURTIN
        P.O. Box 250
        Wilmington, Delaware 19899-0250
          Attorney for Plaintiffs

- - -

CORBETT & WILCOX
Registered Professional Reporters
1400 French Street    Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com

Page 2

```
 1    APPEARANCES (CONT'D.)

 2              MATTHEW T. PISANO, ESQ.
                SEGAL, MCCAMBRIDGE, SINGER & MALONEY
 3              United Plaza
                30 South 17th Street, Suite 1700
 4              Philadelphia, Pennsylvania 19103
                  Attorney for Defendant
 5

 6    ALSO PRESENT:

 7              RITA HOLLOWAY

 8                    -  -  -

 9              MR. PISANO:  For the record,
10    Mr. Curtin, you have agreed to waive any objection to
11    the admissibility of this deposition testimony in
12    light of the fact that I'm not pro hac counsel --
13              MR. CURTIN:  Yes.
14              MR. PISANO:  -- in this matter; is
15    that correct?
16              MR. CURTIN:  On that basis, yes.
17              MR. PISANO:  All right.
18              DOUGLAS HOLLOWAY, having first been
19    duly sworn according to law, was examined and
20    testified as follows:
21                    -  -  -
22                 EXAMINATION
23    BY MR. PISANO:
24         Q    Mr. Holloway, we just met off the record,
```

Douglas Holloway

Page 3

1  and I think we met one time last year. My name is
2  Matt Pisano. I'm an attorney for Monaco Coach
3  Corporation. What we're about to do today is take
4  your deposition.
5            I know you've been through at least
6  one with regards to your previous coach, and I also
7  seem to recall that you were involved in a slip and
8  fall. But just for the sake of the record, I'm going
9  to give you some instructions before we begin today.
10           This is going to be a
11 question-and-answer session, authorized by the
12 Federal Rules of Civil Procedure, where I basically
13 get to ask you questions and you get to provide me
14 answers.
15           Because we're in kind of an
16 informal setting today, I don't want you to be
17 misled. The oath that you just gave to the court
18 reporter is the same oath that you would give in a
19 court of law. Therefore, your testimony today
20 carries the same weight as if you said it in front of
21 a judge and a jury. For that reason, all your
22 answers have to be truthful.
23           In order for your answers to be
24 truthful, you have to understand my questions. If,

Corbett & Wilcox

1  for any reason, you do not understand one of my
2  questions -- because I talk too fast, I mumble, the
3  wording doesn't make sense in your head, whatever the
4  reason -- that's fine.  Just stop and ask me to
5  repeat it or rephrase, and I'll do whatever I
6  possibly can to make the question clear in your head.
7              Do you understand that?
8       A    Yes.
9       Q    Anytime you need to take a break, let us
10 know, and we'll be happy to accommodate you.  What we
11 don't want you to do today is to guess at any of the
12 answers.  If you don't know or you don't recall and
13 that's the truth, that's perfectly reasonable to give
14 me that answer.  I just don't want you to guess.
15              The caveat is if you can give me an
16 estimate or an approximation, if the question calls
17 for that and you have some reasonable basis in your
18 mind, feel free to do that.  Just let us know that
19 it's an estimate or an approximation.  The record
20 will reflect that.
21              In order to make the court
22 reporter's job a little easier, I would ask that you
23 let me finish my question before you begin your
24 answer.  Even though you might correctly anticipate

1  what it's going to be, it's hard for her to take down
2  two people talking at the same time.
3           Additionally, please keep all your
4  answers verbal. If you mean yes, say "yes." If you
5  mean no, say "no." Head shakes, hand gestures don't
6  come across in the record. If I correct you, I'm not
7  trying to be rude; I'm just trying to make sure the
8  record is clear.
9           Anytime your attorney wants to put
10 an objection on the record, I'm going to ask you to
11 hold off on your answer. Let him put his objection
12 on the record, and then he'll instruct you whether or
13 not to answer the question.
14          Do you understand these
15 instructions?
16    A    Yes.
17    Q    Have you had an opportunity to speak with
18 Mr. Curtin today before the deposition?
19    A    Yes.
20    Q    Now that I've given you these
21 instructions, would you like some additional time to
22 speak with him or are you comfortable and ready to
23 proceed?
24    A    Comfortable, yes.

Page 6

```
 1        Q    Is there any medication or substance that
 2   you've taken today that would prohibit you from
 3   understanding my questions and answering truthfully?
 4        A    No.
 5        Q    Now, I understand we're under some time
 6   constraints today?
 7        A    Yes.
 8        Q    What time do you need to leave today,
 9   sir?
10        A    Whenever we get finished.
11        Q    Do you still reside at 2131 Pleasant
12   Valley Road in Newark, Delaware, 19702?
13        A    Yes.
14        Q    I assume your date of birth is still
15   September 28th, 1952?
16        A    Yes.
17        Q    Are you currently employed by Rainbow
18   Kennels?
19        A    Yes.
20        Q    I believe last time we established that
21   that's an incorporated entity?
22        A    Yes.
23        Q    That's incorporated in Delaware?
24        A    Yes.
```

Douglas Holloway

Page 7

```
 1        Q    Tell me again, who are the shareholders?
 2        A    Rita Holloway and Douglas Holloway.
 3        Q    And are you and Rita the only employees
 4   of that organization?
 5        A    You mean do I have other employees or is
 6   it just myself?
 7        Q    Correct.
 8        A    We have other employees.
 9        Q    How many other employees do you have?
10        A    We have two full-time other employees.
11        Q    Is that Rainbow Kennels, Inc., or just
12   Rainbow Kennels?
13        A    Rainbow Kennels, Inc.
14        Q    And just briefly, can you tell me what
15   the business of Rainbow Kennels is.
16        A    Boarding, grooming of dogs and cats; and
17   on the other hand, I show animals also.
18        Q    When you say you show animals, what
19   exactly do you mean?
20        A    I participate in the ring against other
21   animals of the same structure in dog show
22   competition.
23        Q    So it's like Westminster Kennel Club type
24   of contest?
```

Douglas Holloway

Page 8

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And how many dog shows do you do a year? |
| 3 | A | Approximately between 130 and probably 140. |
| 5 | Q | Is there a specific dog show season that these shows encompass, or does it go all year round? |
| 7 | A | All year round. |
| 8 | Q | Where are these dog shows located? |
| 9 | A | Country-wide. |
| 10 | Q | Within the continental United States? |
| 11 | A | No; Europe also. |
| 12 | Q | Of the 130 to 140, how many dog shows in the past year, meaning 2005/2006, have been within the continental United States? |
| 15 | A | All of them. |
| 16 | Q | All 140? |
| 17 | A | For myself. |
| 18 | Q | And how do you get to those 140 dog shows? |
| 20 | A | Station wagon, van. |
| 21 | Q | And I presume that you need to bring the animal with you? |
| 23 | A | Yes. |
| 24 | Q | And do you usually transport the animal |

Corbett & Wilcox

Douglas Holloway

Page 9

1   by road, or do you fly and meet the animal there or
2   some other means?
3       A   Both.
4       Q   You say station wagon or van is how you
5   get to these --
6       A   Yes.
7       Q   -- dog shows?
8           Who owns the station wagon?
9       A   I do.
10      Q   And what year is that station wagon?
11      A   2004, I believe.
12      Q   And who owns the van?
13      A   I do.
14      Q   What year is that?
15      A   2003, I believe.
16      Q   And why would you take the station wagon
17  versus the van or vice versa? Any rhyme or reason to
18  that?
19      A   Yeah. The station wagon, I only have a
20  couple of dogs that I can fit in, and I unload into a
21  building and participate in the shows.
22      Q   I still don't understand. Why would you
23  take the station wagon versus the van?
24      A   The van I take on longer trips, more

1  equipment.
2     Q   Now, the reason we're here today revolves
3  around the sale of a 2004 Beaver Monterey motor home.
4           Have you ever used a 2004 Beaver
5  Monterey for dog show purposes?
6     A   Yes.
7     Q   How many times?
8     A   Offhand, I don't know.  I don't
9  recollect.
10    Q   Okay.  You took possession of the 2004
11 Monterey in February of 2004; is that correct?
12    A   No; March.
13    Q   So it's basically two years from sitting
14 here today; is that correct?
15    A   Correct.
16    Q   In those two years, you don't have any
17 recollection as to how many times you used that
18 Monterey for dog show purposes?
19    A   No.
20    Q   Do you have any idea how many times you
21 used that -- strike that.
22           Can you quantify it in terms of
23 percentages?  In other words, you used it for a dog
24 show 10 percent of the time?

Douglas Holloway

Page 11

1    A    I don't know for the simple reason it's
2  been in the shop more times than I recollect.  I
3  mean, it's been in the --
4    Q    Well, how many miles do you think that
5  the coach has on it today?
6    A    My miles or total miles?
7    Q    Total miles.
8    A    Total miles, probably has 40,000.
9    Q    Out of those 40,000 miles, how many of
10 those have been put on by the Holloways or Rainbow
11 Kennels?
12   A    Approximately -- my personal use,
13 probably 20,000, approximately.
14   Q    Okay.  That's fine. And out of those
15 20,000 miles, how many have been used for dog show
16 purposes?
17   A    It's a question that -- I'll go on a
18 vacation, and I'll take my dogs with me and I also
19 pull my vehicle behind the coach.  So the coach will
20 stay in a resort, and I'll go to the dog show.
21   Q    But for the dog show, would you still be
22 going to those resorts, to those vacations?
23   A    Yes.
24   Q    You would, regardless?

Corbett & Wilcox

Douglas Holloway

Page 12

1    A    Yes.

2    Q    And approximately out of those 20,000 miles, how many of them have been for resort, slash, dog shows?

5    A    I don't -- I don't recollect, honestly.

6    Q    Would you say more than half?

7    A    I'll say half, approximately. I'm not sure.

9    Q    So 10,000 of the 40,000 miles on the coach have been used for dog show purposes; is that fair?

12    A    Whether or not I had the coach, I still would be going to the dog shows in my van. I use the motor coach for my enjoyment to go to where I'm going, and then I go to the dog show.

16    Q    But would it be fair to say that 10,000 of the 40,000 miles on the coach have been used directly or indirectly as a result of dog shows?

19    A    Yes.

20    Q    Now, you indicate that you pull, you tow a personal vehicle behind the motor home on occasions?

23    A    Yes.

24    Q    Out of the 20,000 miles, how many of

Corbett & Wilcox

Page 13

1    those miles have been with a vehicle in tow?
2        A    I have no idea.
3        Q    Can't give me an estimate?
4        A    No.
5        Q    Out of the 10,000 miles that you used for
6    dog shows, either directly or indirectly, how many of
7    those miles have been used with a vehicle in tow?
8        A    Probably three quarters of that.
9        Q    So 7500 miles?
10       A    Yes.
11       Q    Now, when we say "vehicle in tow," is
12   there a specific vehicle or different vehicles that
13   are towed?
14       A    Specific vehicle.
15       Q    Which vehicle is that?
16       A    Honda Element.
17       Q    And do you happen to know the gross
18   vehicle weight of the Honda Element?
19       A    No.
20       Q    When you tow the Element, is that vehicle
21   also packed with equipment or clothes or anything?
22       A    No.  I might put a bicycle in the back of
23   it.  No.
24       Q    Now, when you previously told me the

Page 14

```
 1   station wagon or the van, are either of those the
 2   Honda Element?
 3        A    Yes.
 4        Q    Which one would that be?
 5        A    The station wagon.
 6        Q    Now, I think we've established that
 7   you've given a deposition with regard to the lawsuit
 8   surrounding your 2001 motor home?
 9        A    Yes.
10        Q    And I seem to recall that you also gave a
11   deposition as a result of a slip and fall; is that
12   correct?
13        A    Yes.
14        Q    Any other depositions that you've given
15   since those two?
16        A    Those are the only two I've ever given.
17        Q    Other than this lawsuit, the 2001
18   lawsuit, and the slip and fall lawsuit, have you ever
19   filed a lawsuit for any other reason?
20        A    No.
21        Q    Has a lawsuit ever been filed against you
22   for any reason?
23        A    No.
24        Q    What was the resolution of the slip and
```

Douglas Holloway

Page 15

1   fall, if there has been one?
2       A   Came to terms.
3       Q   Was there an out-of-court settlement?
4       A   Yes.
5       Q   Was there a monetary payment to you?
6       A   Yes.
7       Q   Are the terms of that settlement
8   confidential, to the best of your knowledge?
9       A   I believe so.
10      Q   Who was your attorney handling the slip
11  and fall?
12      A   Mr. Castle, Ben Castle.
13      Q   Are you still using Dennis Snyder as your
14  accountant?
15      A   Only on occasions.
16      Q   Who prepared your 2003 personal tax
17  returns?
18      A   Oh, I'm sorry.  My mistake.  Yes, Dennis
19  Snyder is my accountant.  I was thinking of another
20  gentleman.  Okay.  Never mind.
21      Q   Who was the other gentleman you were
22  thinking of?
23      A   Attorney for my water rights.
24      Q   I'm sorry.  What do you mean, the

Corbett & Wilcox

Douglas Holloway

Page 16

1  attorney for your water rights?
2      A    Due to personal property, on the
3  property, they -- trying to have their waterway --
4  they've clogged my property up with water, and now
5  they're just -- I had to get him to talk to the
6  New Castle County.
7      Q    Who is "they"?  New Castle County?
8      A    Actually, the developer next door.
9      Q    And has there been any type of lawsuit
10 filed as a result --
11     A    No.
12     Q    -- result of that?
13          So Dennis Snyder is still your
14 accountant?
15     A    Yes.
16     Q    He has been your accountant since at
17 least 2000?
18     A    Yes.
19     Q    And does he handle your personal and
20 corporate tax returns?
21     A    Yes.
22     Q    And he's located in Wilmington; right?
23     A    Yes.
24     Q    Do you know where he's located at or what

Corbett & Wilcox