caulking, redo the seams. I have no idea how they did it. And then they recaulked everything.

Q Now, you were asked several times about the fuel smoke problem. Was that caused by any lack of maintenance?

A No, it was not.

MR. PISANO: Objection to the form.

BY MR. CURTIN:

Q What's your understanding of what caused the diesel fuel smoking problem?

A It was a factory defect.

Q Do you know how many times they had to try to repair it before they did repair it?

A I think they repaired it on the fifth time. But it was four times attempted to repair it.

Q And wasn't the problem having something to do with an improperly welded flap?

MR. PISANO: Objection to the form.

THE WITNESS: Yes.

BY MR. CURTIN:

Q Did you ever weld anything --

A I have never done anything do it. I let the service centers -- Monaco-related service centers take care of the problem.

Q Now, the diesel fuel blow-back problem, to your knowledge, has anybody said that that was a lack of maintenance on your part?

A No.

MR. PISANO: Objection to the form.

BY MR. CURTIN:

Q Has anybody told you it was because you drove it to a dog show?

A No.

Q Has it been fully fixed?

A As we speak, yes. But it still blows out fumes and sprays out -- doesn't -- yeah, when you open up the cap.

Q Is it different from other diesel fuel tanks you've opened?

A Yes.

Q In what way is it different?

A It -- I believe it's creating a vacuum while it's in -- while the fuel cap is on, while the engine is running. And when you go to fill it up, it just forces the air all out.

Q When was that problem finally fixed?

MR. PISANO: Objection to the form.

THE WITNESS: In the September

until December trip to Indiana.

BY MR. CURTIN:

Q What year?

A 2005.

Q So from 2004, when you bought it, picked it up, and through 2004, into 2005, it was not fixed?

A Correct.

MR. PISANO: Objection to the form.

BY MR. CURTIN:

Q The diesel fuel smell on the interior of the coach, when did you first notice that?

A The minute we purchased the coach.

Q And when was it ultimately fixed?

MR. PISANO: Objection; asked and answered.

THE WITNESS: It's still -- it's not as bad, but you can still smell diesel fumes on occasions.

BY MR. CURTIN:

Q Is that different from other coaches you've experienced?

A Yes.

MR. PISANO: Objection to the form.

BY MR. CURTIN:

Q Let's turn attention to the suspension issues.

What did you notice about -- if anything, about the suspension that displeased you?

A Very hard ride on every bump you hit in the road or -- and a tremendous amount of roll.

Q And when did you first notice the suspension issue?

A Immediately.

Q When did you first report it to --

A Within the first month of the purchase of the coach.

Q And when was it corrected?

MR. PISANO: Objection; asked and answered.

THE WITNESS: The ride itself, the air ride was fixed in the summer of 2005.

BY MR. CURTIN:

Q And who fixed that?

A It was a work facility in Harrisburg, Pennsylvania.

Q What was the problem that caused the suspension --

A The ride --

MR. PISANO: Objection.

THE WITNESS: The ride itself was not set correctly at -- at the right settings for air ride.

BY MR. CURTIN:

Q Do you know what the repair facility did to correct it?

A Called the Beaver factory in Bend, Oregon. They told them what to set the height of the air ride at, and it's been -- the height of the coach itself now, and it gives a better ride.

Q Is there some relationship between the suspension issue and the shock absorbers?

MR. PISANO: Objection to the form.

THE WITNESS: The way it was explained to me is that the air ride itself was low. Basically not being used as an air ride on the coach, that the shocks were being used as the absorbent cushion.

BY MR. CURTIN:

Q During the first year that you owned this vehicle, can you estimate whether the vehicle was out of service more than 30 days?

A Yes, it was.

Q Was it out of service, in your estimation, more than 60 days?

A Yes, it was.

Q Can you estimate whether it was out of service more than 100 days --

A Yes, it was.

Q -- in the first year?

200 days?

A Yes.

Q Was it out of service more than 200 days?

A I don't recollect --

MR. PISANO: Objection.

THE WITNESS: -- but I believe it was.

BY MR. CURTIN:

Q And all told, in the two years that you've -- since you've bought the vehicle, is it fair to say that it's been out of service for nearly 300 days?

A Yes, it has been.

Q And they're due to the various repairs that we've discussed today?

A Yes.

MR. PISANO: Objection to the form.

MR. CURTIN: That's all the questions I'm going to ask. Thank you.

FURTHER EXAMINATION

BY MR. PISANO:

Q Did you use your coach yesterday?

A No, I did not.

Q Was that because of some sort of repair issue?

A Let's see. What was I doing yesterday? I believe I was working.

Q Have you ever heard of the term "goodwill repair"?

A I'll say yes.

Q What's your understanding of the term "goodwill repair"?

A Is that when they repair something that they don't have to and they don't charge you for it?

Q Is that your understanding of the word "goodwill repair"?

A I believe so.

Q Have you ever had the occasion to have a goodwill repair performed on either your 2001 or your 2004 Monterey?

A Yes, I have.

Q Do you have any children?
A No, I do not. I have stepchildren.
Q Now, do they live at home?
A No, they do not.
Q What family do you have at 2001 -- what family do you have at 2131 Pleasant Valley Road?
A My wife.
Q What's the business address of Rainbow Kennels?
A 2131 Pleasant Valley Road.
Q Anybody else live there with the two of you?
A No. We have friends stay over.
Q Any family?
A No.
Q So the family and the business are in the same place?
A Not the same building; same property.
Q Same address; correct?
A Right, yes.
Q What year did Rainbow Kennels become incorporated?
A I don't recollect that right offhand.
Q Do you recall how you went about the

incorporation process? Did you use an attorney?
A Used an accountant.
Q What accountant? Snyder?
A Correct.
Q Who maintains the corporate books?
A Snyder.
Q Does Snyder hold any type of board position in the corporation?
A No.
Q Who are the board members?
A Myself and my wife.
Q Do you have a copy of the corporate bylaws?
A I don't, no.
Q Does your wife?
A She might.
Q Is there one at 2131 Pleasant Valley Road?
A I do not know.
Q Do you know if the accountant has a copy of the bylaws?
A I'm sure he would.
Q When is the last time a corporate meeting was held?

A I don't recollect.

Q Was there one held in 2006?

A No.

Q Was there one held in 2005?

A I don't believe so.

Q Was there one held in 2004?

A I don't know.

Q When corporate meetings are held, is there a secretary there taking minutes?

A He always brings a staff or two staff members with him.

Q Who is "he"?

A Mr. Snyder.

Q What's Mr. Snyder's purpose of coming to the corporate meeting?

A He's my accountant.

Q He doesn't hold any type of board position?

A No.

Q He's not a secretary?

A No.

Q When is the last time Mr. Snyder came to a board meeting?

A I don't recollect.

Q Do you recall who the two staff members were?

A No, not offhand.

Q Do you have a copy of any minutes?

A No, I do not.

Q Your attorney purports that you incurred air fare expenses in April of 2004. Do you recall what that was regarding?

A April 2004, probably going down -- either coming home from delivering the coach or going down to pick up the coach from Lazy Days.

Q What's LOF?

A I have no -- just -- I'm drawing a blank on that, LOF.

Q There's out-of-pocket expenses itemized by your attorney. And the date of May 4th, 2004, as well as October 7th, 2004, there are two notations of LOF. The first, May 2004, indicating $775.39; the second, October 7th, 2004, indicating $317.50.

A Could be flying.

Q Why isn't that listed as air fare?

A I don't know. I don't know. I really don't know.

Q Did you prepare the summary of damages

for 2004?

A No, I did not.

Q The Tab 3 that Mr. Curtin was showing to you earlier, did you prepare that summary of damages?

A No, I did not.

Q Your fuel damage leak accident out-of-pocket expenses with regard to that are listed as $6,569.63. Was that not reimbursed by insurance?

A Yes, it was.

Q So you weren't out of pocket $6,569.63; is that correct?

MR. CURTIN: Objection to the form of the question.

THE WITNESS: Might not have been. We put in a claim -- it might have been coming out of my pocket. I'm not sure. I'd have to check and find out. I'm sorry.

BY MR. PISANO:

Q Do you happen to know the policy number insuring the coach?

A No, I do not.

Q You don't have that information with you today?

A No.

Q Can you provide that to your attorney, please?

A Sure.

MR. CURTIN: Sure.

BY MR. PISANO:

Q The Hydro-Hot rebuild is listed as $1,220.41. You had to pay that out of your pocket?

A Yes, I did.

Q Did you try to resubmit that to Monaco?

A I believe Cindy Edget has a copy of that.

Q And that wasn't covered as part of a recall?

A No.

Q Have you ever done anything to follow up?

A Handed it to my attorney.

Q Aggravation and inconvenience is itemized as $15,000.

A Okay.

Q What is covered in that $15,000?

A Well, I guess driving back and forth, flying down there, waiting; and inconvenience of having it not ready when it's supposed to be ready.

My wife ended up staying there for multiple weeks while they were still working on it

when it was supposed to be finished at whatever time they said it would be. She went down, waited for it, had to stay there for three weeks, et cetera.

Q What are you basing all that as equating to $15,000? How do you equate that to $15,000?

A Well, it's like this past --

Q Is there some sort of formula or mathematical calculation that I could use?

A I don't have any idea. I guess it's just what the attorney came up with.

Q So far as you know, you never told him that your aggravation and inconvenience was worth $15,000?

A Correct.

Q It's just an amorphous number; is that correct --

A Right.

Q -- as far as you know?

Have you ever used Mr. Curtin's services --

A Yes, I have.

Q Let me finish the question.

Have you ever used Mr. Curtin's services for anything other than pursuing this action

or the 2001 Action?

A Never.

Q Have you ever retained an attorney for any other type of Lemon Law litigation?

A Never.

Q The attorney that you used for your slip-and-fall case, do you know what his billable rate was?

A No, because workers' comp paid for it. And -- and the owners of the facility where I fell paid for it.

Q You put a workers' comp claim in as a result of that slip and fall?

A (Witness nods head.)

Q What insurance company was that?

A State Farm.

Q Do you have any idea sitting here today what Mr. Curtin's billable rate is?

A Not right offhand.

Q Do you have that written down somewhere?

A I have it on one of his -- probably his many documents that he sends me, yes.

MR. PISANO: That's it. This time I really am done. Unless he wants to ask a couple

more questions, and then God knows.

MR. CURTIN: No further questions.

MR. PISANO: Read and sign or waive?

MR. CURTIN: I think we would like to read -- no, I don't think we need to read it.

MR. PISANO: I would appreciate that, because it will get to me quicker.

(Deposition concluded at 12:05 p.m.)

# I N D E X

| WITNESS: | PAGE |
|---|---|
| DOUGLAS HOLLOWAY | |
| Mr. Pisano | 2 |
| Mr. Curtin: | 156 |
| Mr. Pisano: | 173 |

# E X H I B I T S

| HOLLOWAY | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Faxed repair estimate and cover page dated 2-2-06 | 92 |
| 2 | Repair documents from Monaco Coach Corporation dated 1-30-06 | 94 |
| 3 | Repair documents from Monaco Coach Corporation 3-7-06 | 102 |
| 4 | Retail installment contract and security agreement dated 10-17-00 | 140 |
| 5 | Retail installment contract, security agreement and disclosure statement dated 1-10-04 | 143 |
| 6 | Beaver motohome limited warranty | 150 |

CERTIFICATE

State of Delaware :

New Castle County :

I, Gail Inghram Verbano, the officer before whom the foregoing proceedings were taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me before the commencement of the deposition; that the testimony of said witness was taken by me, in Wilmington, Delaware, on March 14, 2006, to the best of my ability and thereafter reduced to writing under my direction; and that I am neither counsel for, related to, nor employed by any of the parties of the above-titled action; and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

WITNESS my hand and official seal this 19th day of March A.D. 2006.

Gail Inghram Verbano
Gail Inghram Verbano, RPR-RMR
CSR No. 8635
Certification No.: 220
(Expires 1-31-2008)

Fax
574 862 7772

Monaco Coach Corporation
1028 E. Waterford
Wakarusa IN 46573
Plant 39 Service Center

Facsimile transmittal

| | | | |
|---|---|---|---|
| To: Doug Holloway | | Fax: (302) 737-5256 | |
| From: BOB McKINLEY | | Date: 2/2/06 | |
| Re: ESTIMATE | | Pages: 2 (including cover sheet) | |
| CC: | | | |

☐ Urgent ☑ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

X [signature] X

LOOK OVER. IF YOU HAVE ANY QUESTIONS CALL ME. IF NOT SIGN & FAX BACK TO (574) 862-7306. THANKS BOB

X Air Leak at entrance door

BOB have no problem with estimate except I do question Batteries they were fine when dropped off, they were not serviced with vechicle when asked to and I paid for service.

also Bob - Bedroom slide was worked on last time should be no charge.

CONFIDENTIAL

EXHIBIT 7h
Holloway
3-14-06

p.2

DOUGLAS & RITA HOLLOWAY Feb 07 06 08:48a

# Repair Estimate

**Monaco Coach Corporation**
**1028 E. Waterford Street**
**Wakarusa, IN 46573**
**Ph: 574-862-7304**
**Fax: 574-862-7306**

| | |
|---|---|
| R.O. No.: 80083873 | Name: DOUGLAS HOLLOWAY |
| Customer No.: 800870 | Address 2121 PLEASANT VALLEY RD |
| Date: 02/01/06 | City: NEWARK State: DE |
| Year/Make 04 BEAVER | Zip: 19702 |
| Model: MONTEREY | Home Ph: 302-738-0864 |
| Coach Serial No041620824088401800870 | Work Ph: |
| Chassis Serial No: 1RFC256454102131 | |
| Current Odometer Reading: | |
| Save Old Parts: ( )Yes ( ) No (Core May Apply) | |

| QTY | PART NO. | DESCRIPTION | LAB HRS | PARTS | EXT LAB |
|---|---|---|---|---|---|
| 2 | | RESTRING DAYNIGHT SHADES | | $16.00 | |
| 1 | | SECURE MIRROR ON REFER CABINET | 0.75 | $2.00 | $69.00 |
| 4 | 18614034 | REPLACE BATTERIES | 1.00 | $384.56 | $92.00 |
| 1 | | ADJUST BEDROOM S/O | 0.50 | | $46.00 |
| 1 | | REPAIR SQUEEK IN S/O'S | 0.50 | | $46.00 |
| 1 | | REPAIR ENTRANCE STEP IRRATIC OPERATI | 0.50 | | $46.00 |
| 8 | 1805533 | REPLACE SHOCKS | 4.00 | $660.00 | $368.00 |
| 1 | | REPLACE GENI SWITCH ON DASH | 0.20 | $18.48 | $18.40 |
| 1 | | REPLACE VALVE STEM EXTENSIONS | 1.00 | $35.09 | $92.00 |
| 1 | | REPAIR AIR LEAK D/S COCKPIT WINDOW | 0.50 | | $46.00 |
| 1 | | SERVICE ENGINE | | $375.00 | |
| 1 | | SERVICE GENERATOR (REMAIN OPEN) | | | |

(Handwritten beside items 2–5:) your responsible, should be no charge

(Handwritten in table:) BOB — question Batteries, also slide adjustment in bedroom, air Leak at entrance door and rattle

**LABOR CHARGES BASED ON $92.00/HOUR RATE**

**There is a 90 day warranty on all parts and labor unless otherwise specified.**

| ESTIMATED CHARGES: | |
|---|---|
| Labor | $823.40 |
| Hazardous Waste Charge | $10.00 |
| *Shop Supplies (5% Labor) | $41.67 |
| Parts | $1,493.13 |
| Tax (6% Parts & Shop Supplies) | $92.09 |
| Subtotal: | $2,460.29 |
| Sublet/Other | |
| Sealant | |
| ESTIMATE TOTAL: | $2,460.29 |

By initialing below I understand this is an estimate based on your initial inspection of my vehicle. Occasionally, after work has started; worn, broken or damaged parts are discovered which are not evident on first inspection. Quotations on parts and labor are current and subject to change.

X______

*This charge represents costs and profits to the motor vehicle repair facility for miscellaneous shop supplies.

Authorization for Repair - You are hereby authorized to make the above specified repairs to the vehicle described above.

X [signature]

Date: 2/2/06

**Estimate Prepared By:**

If the actual costs exceed 10% of the written estimate, Monaco Coach will obtain written permission from the customer to proceed with the repair before performing the same.

1/2